MAYVIEW CORP., an Illinois corporation,
Plaintiff,

v.

Harvey B. RODSTEIN, an Individual,
et al., Defendants.

Harvey B. RODSTEIN, an Individual,
et al., Counter-Plaintiffs,

v.

MAYVIEW CORP., an Illinois corporation,
et al., Counter-Defendants.

Nos. 71–531, 71–1832–DWW.

United States District Court,
C. D. California.

Sept. 12, 1974.

See also 9 Cir., 480 F.2d 714.

Smyth, Roston & Pavitt, Los Angeles, Cal., for plaintiffs and counter-defendants.

Herzig & Walsh Inc., Beverly Hills, Cal., for defendants and counter-plaintiffs.

## MEMORANDUM DECISION

DAVID W. WILLIAMS, District Judge:

Mayview Corporation brought an action for a declaratory judgment against Harvey Rodstein and companies controlled by him to have Patent No. 3,-563,134 ('134) on a straight line sander and three design patents [1] declared invalid and not infringed by plaintiff. Plaintiff included a cause of action alleging a Sherman § 2 violation and further contending that the '134 patent was invalid because Rodstein was not the true inventor and had also practiced fraud upon the patent office. Defendants counterclaimed charging infringement of all four patents and of the trademark "Rodac." Other counter claims were abandoned at trial. Mayview admits offering for sale in this district and elsewhere, single-piston straight-line sanders, orbital sanders and drills and it is these that defendants claim infringe. The parties are competitors in the manufacture and distribution of hand-operated air tools.

The history of the development of the '134 patent is integral to the issues of validity and infringement. Prior to 1966, Air Tool Corporation of America (ATCOA) developed and produced a straight line sander which it called the Viking and which became the subject of Patent No. 3,215,823 ('823) now issued Nov. 2, 1965. This was a double piston tool. ATCOA also produced a single piston straight line sander which it called the Cobra and which became the subject of Patent No. 3,399,494 issued Sept. 3, 1968.

ATCOA arranged with Rodstein to have the two models manufactured in Japan by Shoei Electric Co. and bring them to the United States to sell to ATCOA for resale. Later, Rodstein's company (Rodac) became involved in litigation with ATCOA and as part of the settlement Rodstein ceased to import the sanders.

At that point Rodstein decided to develop his own straight line sander for manufacture which he hoped would not infringe upon either the Viking or Cobra. He solicited the help of his associates Tom Sato (son of the owner of Shoei Electric) and counterdefendant Irving Fisher for ideas concerning a single piston tool. Sato and Fisher tried to develop such a sander and Rodstein was aware of their work.

Sato turned out drawings of a single-piston sander which included a valve disposed above the single double-ended piston at a position intermediate the length of the piston. His father constructed a unit from the drawings and Rodstein brought the unit from Japan to the United States in September 1968.

Fisher's work produced a spring-driven single piston sander that proved unsatisfactory. He then produced a crude prototype of a straight line sander with a single double-ended piston by using copper tubing to introduce air under pressure alternately to opposite

---

[1]. Design Patents 210,793 and 210,794 on orbital sanders and Design Patent 218,086 on a pneumatic drill.

ends of the piston so as to drive the piston on a reciprocating basis in opposite directions. Rodstein knew of this work.

Later, Rodstein hired Kunio Sumida to develop his idea. Sumida is a highly qualified engineer with a number of patents in various technical fields. He designed and developed a prototype sander similar in operating principle to the Viking but having one double ended piston like the Cobra. In assembling this, Sumida used several parts from a Viking sander but changed some other parts. Eventually he developed a tool that had high reciprocation with a low vibration level and Rodstein seemed well pleased with the testing. He told Sumida he was going to take the prototype to Japan to be produced and that he could "lick the market." Indeed he did have Shoei manufacture the unit for him for sale in this country. In 1969 Shoei changed ownership and became known as Compact Tools and the new company made tools for Rodstein.

It was the Sumida prototype that was to later become the '134 patent. Thereafter, Mayview placed orders for air tools with Compact and one of Mayview's sanders, the Astro, is substantially similar to the Rodac sander based upon the '134 patent. This forms the basis for the present infringement claim.

The '134 patent discloses a sander which includes a body with a longitudinal bore. A single double-ended piston is positioned within the bore and is reciprocatable within the bore. A rotary valve having a vertical axis communicates with the bore. It includes a cylindrical sleeve, a valve member and a drive member which are provided with slots to communicate with the piston so that air under pressure can pass through slots in the valve and be applied to one end of the piston while air is being exhausted through other slots in the valve from the other end of the piston.

A spur or pinion gear is carried by the drive member and is engaged by a rack gear movable with a shoe. A rack gear member having teeth on its underside is supported by the piston between the opposite ends of the piston. The rack gear meshes with a pinion gear which in turn meshes with another rack gear to which is attached a reciprocatable shoe.

Air under pressure is applied first to one of the piston ends to drive it in one direction and at the same time air is exhausted from the other piston end. This is alternated and the end result is a reciprocating motion of the shoe when the piston means and the shoe are driven in opposite directions. Vibration is kept to a minimum by balancing the mass of the reciprocatable piston against the mass of the reciprocatable shoe.

Defendants claim that a major achievement of the '134 patent is that it accomplishes a more precise balancing between these members and thus reduces vibration to commercially acceptable limits; but the Viking '823 patent explained the balancing of the weights of the piston and the shoe to reduce vibration.

Courtroom tests were conducted with several sanders and it was possible to experience by feel and then to observe by instrument measurement the varying levels of vibration during operation of the tools.

I was not convinced that the '134 patent contributed in an inventive way to the art of balancing, or that it achieved total elimination of vibration.

The '134 patent is entitled to the presumption of validity by virtue of its issuance by the Patent Office. 35 U.S.C. § 282. However, the presumption is not conclusive, but exists simply to give the grant substance and value. Mayview v. Rodstein, 480 F.2d 714, 718 (9th Cir. 1973). Mayview strongly urges invalidity on the grounds that a body of prior art existed at the time of the issuance of the '134 patent which negatived novelty and invention, 35 U.S. C. §§ 102, 103, and that material mis-

representations to the Patent Office amounted to fraud in the issuance of the '134 patent. The contention is meritorious.

The tests of validity are utility, novelty and non-obviousness. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). In that case the Court instructed that the obviousness or non-obviousness of the subject matter of a patent is to be determined by pursuing the following line of inquiry: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art. The '134 must be measured against prior art, namely the Viking ('823), Cobra ('494) sanders, and the Sumida prototype.

The '134 patent is that of single double ended piston straight line sander used principally in the preparation of automobile body surfaces for painting. Both Rodstein and his expert witness, Warren Jessup, admitted that the only essential difference claimed to be embodied in the Rodac sander over prior art is the element of balancing the piston and shoe in a single double ended piston straight line sander. That teaching appears in claim 1 of the '134 patent, "the mass of the reciprocatable [single double ended] piston means being balanced with respect to the mass of the reciprocatable shoe whereby vibration of the device is reduced to a minimum."

There are three essential mass parts to the sander—the body, the piston and the shoe. Two causes of vibration in the tool may prove tiring to a worker—the frictional force of the sander on the sanded object, and the internal vibration or oscillation of the piston and the shoe which are mounted on the body, i. e., the back and forth movement of the piston inside the body, and the opposite movement of the shoe on the bottom of the body. Since the vibration is directly proportional to the difference in weight between the shoe and the piston, by reducing the mass differential

the vibration is thereby reduced. The '134 patent is thus claimed to teach balance in a single piston straight line sander.

Problems of hand-held tools are common in the industry. The concept of balance is not new to the art however. Mayview's expert witness John L. Ryde, who while chief engineer at the McCulloch Corporation did numerous studies on fatigue caused by power hand tools, testified that the use of balance is very old. In fact, the concept of balance appears in the Viking '823 double piston sander, as may be seen in a discussion in column 7, lines 1 to 10, inclusive, of the '823 patent:

> "Thus, it may be seen that when the pistons 66 and 68 are moving forwardly the slide connector rack 118 is moving rearwardly. The weight of the slide connector rack 118 and the tool such as the file 134 secured thereto is pre-determined so that a movement of the pistons 66 and 68 in a direction opposite to the slide connector rack 118 will maintain the machine 10 in proper balance. This, of course, will greatly reduce the tendency of the machine 10 to vibrate even while operating at high speeds."

Similarly, the concept of a single double ended piston in the '134 is also anticipated. The Cobra '494 sander discloses the use of a single double-ended piston in a straight line sander.

There was concurrence by both experts that the Rodac straight line sander achieved a somewhat lower vibration level than the Viking or Cobra. However, the presentation of evidence that the '134 was really a significant improvement over prior art was almost totally lacking. Rodstein's only live witness at trial was Warren Jessup, an engineer and patent lawyer. He conducted no scientific comparisons of balance or vibration level among various sanders. In fact, he did not even test the Cobra or Viking. Instead his opinion rested on the subjective sensitivity of his hands while operating the Rodac sander. From

this operation alone, he concluded that the '134 had achieved balance and reduced vibrations to a "commercially acceptable minimum" in a single piston sander, thus achieving a surprisingly new result.

In contrast, Ryde concluded that the '134 was not novel, but merely a combination of the concepts underlying the Viking and Cobra patents. He did conduct scientific tests comparing balance and design in the various sanders, employing use of an oscilloscope and camera, and did not find any fundamental improvements over prior art. This testimony was bolstered by Sumida, the designer of the prototype that led to the '134 patent, and which can also be considered prior art to the '134 patent. When asked why he, Sumida, did not seek a patent on his prototype design, he stated that he did not believe that he had invented anything patentable, in light of the teaching of the Viking and Cobra.

■ The validity of a patent cannot be upheld when it is merely a combination of known prior art elements. Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The improvement must be that of an inventor and not merely the work of a skillful mechanic. Hotchkiss v. M. Greenwood, 52 U.S. (11 How.) 248, 267, 13 L. Ed. 683 (1851). Where each of the elements in the patented process was covered by the prior art, the patent cannot stand. Bada Company v. Montgomery Ward & Co., 426 F.2d 8 (9th Cir. 1970). In this instance, where the '134 patent is anticipated by prior art of the Viking, Cobra and Sumida prototype, its validity cannot stand.

### FRAUD UPON THE PATENT OFFICE

"A patent applicant has a duty to the Patent Office to make a full and fair disclosure of all facts which may affect the patentability of his invention." Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294 (9th Cir. 1969). Plaintiff charges that deliberate misrepresentations to the Patent Office by Rodstein of material facts regarding the novelty and operation of prior art constitute a fraud on the Patent Office: (1) the existence of fraud because of the failure to call the '494 patent on the Cobra sander to the attention of the Patent Office; the existence of fraud because of Rodstein's knowledge that he was not the inventor of the '134; the existence of fraud in misrepresenting that the "balance" taught in the '134 was significantly different and a significant improvement over the Viking '823 prior art. The evidence produced at trial supports the charges of fraud with respect to the '134 patent.

■ The first two of the instances of fraud are particularly flagrant abuses of the patent process. Rodstein was fully aware of the Cobra sander prior to the filing of the application for the '134 patent and during its prosecution. In fact he had earlier imported the Cobra sander. The attorneys for Rodstein were also aware of the Cobra sander prior to filing. In that it is a single double ended piston straight line sander, the significance of the Cobra as a reference against the '134 is inescapable. Rodstein failed to cite the Cobra, citing instead a much less analogous patent to a single piston windshield wiper. The failure of Rodstein to cite the Cobra can only be construed as an intent to deceive or at most a reckless disregard of the consequences since the '134 patent would not have issued if the Patent Office knew of the Cobra. The failure of Rodstein to call to the attention of the Patent Office significant prior art which was known and which he should have known would affect patentability of the '134 patent constitutes a fraud on the Patent Office. Intermountain Research Co., Inc. v. Hercules, Inc., 171 USPO 577, 623, 631 (D.C. Cal.1971); Becton, Dickinson & Co. v. Sherwood Industries, Inc., 175 USPO 337, 344–346 (M.D.Fla.1972); Penn Yan Boats, Inc. v. Sea Lark Boats, Inc., et al., 359 F.Supp. 948, 964–965, (S.D.Fla. 1972), aff'd 479 F.2d 1328, (5th Cir.

1973), cert. den. 414 U.S. 874, 94 S.Ct. 66, 38 L.Ed.2d 115 (1973).

Similarly inexcusable is Rodstein's failure to cite the Sumida prototype as prior art, or to at least acknowledge Sumida as co-inventor of the '134 patent, as would be required by 35 U.S.C. § 115. See Rival Mfg. Co. v. Dazey Products Co., 358 F.Supp. 91 (W.D. Mo.1973); *Intermountain Research*, supra; *Becton, Dickinson & Co.*, supra.

## THE THREE DESIGN PATENTS

■ Mayview originally sought declaratory relief as to invalidity and non-infringement of three of defendants' design patents. Although Rodstein counterclaimed for infringement, it abandoned that claim at trial. The remaining issue then was the Mayview allegation of invalidity resulting from fraud on the Patent Office with respect to the three Design Patents.

Design Patent D–210,793 is that of an orbital sander, marketed by Rodstein as the Rodac 815 sander. Prior to the conception of D–210,793, Hutchins started to market orbital sanders designated as the "800" and the "900." Rodstein was aware of the Hutchins' sanders at the time he was working on the design of the Rodac 815. A comparison of the Rodac 815 and Hutchins 900 indicates that the Rodac is almost identical in design, and yet Rodstein failed to bring the Hutchins sander to the attention of the Patent Office during the application for D–210,793. In light of this serious omission, Rodstein committed fraud on the Patent Office in failing to call the Hutchins 900 to its attention.

Similarly, Rodstein was aware of the Hutchins 800 sander during the development of the Rodac 820, an orbital sander. The design of the external appearance of the Rodac 820 is substantially identical to the external appearance of the Hutchins 800, except for the handle. The Rodac 820 is covered by design patent D–210,794. Rodstein was under an obligation to call this pertinent prior art to the attention of the Patent Office.

In failing to do so, a fraud was committed on the Patent Office.

Rodstein also was issued design patent D–218,086 on a drill. At the time of the designing of '086 Rodstein was aware of the pertinent prior art of the ARO drill and Michigan Pneumatic drill. The '086 design is substantially similar to the Michigan Pneumatic drill except that the external appearance was modified primarily by squaring the body to provide a scalloped configuration with a number of sharp corners. In failing to call this pertinent prior art to the attention of the Patent Office, Rodstein was derelict in his duty during the prosecution of Design Patent D–218,086.

It may be said, then, that Rodstein committed fraud upon the Patent Office by (a) failing to call the '494 patent to its attention, by (b) misrepresenting that he had balanced the weight of the piston against the weight of the shoe to eliminate vibration and by (c) representing that he was the inventor when he clearly was not. 35 U.S.C. § 115. At the very least, he was obligated to show Sumida as co-inventor. In this connection it is interesting to note that Sumida testified that he didn't apply for a patent on the prototype he produced (which became the '134 patent) because he didn't think he had invented anything. Mayview argues that Rodstein showed a propensity for hoodwinking the Patent Office by his failure to call that agency's attention to appropriate prior art with reference to the design patents.

## MALICIOUS PROSECUTION

■ I am not convinced that plaintiffs have sustained their claim of malicious prosecution. While defendants abandoned many claims at trial, they vigorously contested the main patent in suit, the '134 patent, from the beginning of this action through trial. The fact that defendants' case was very weak and unconvincing, and that patent invalidity was eventually proved, does not in my estimation amount to proof of ma-

licious prosecution—in particular, where plaintiffs initiated the lawsuit.

## SECTION 2 OF THE SHERMAN ACT

Plaintiffs have also alleged herein that defendants have violated § 2 of the Sherman Act, 15 U.S.C. § 2. In Walker Process Equip. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Supreme Court decided that the maintenance and enforcement of a patent obtained by fraud on the Patent Office may be the basis of an action under Section 2 of the Sherman Act for monopolization or attempted monopolization. However, the Court did not hold that patent misuse constitutes a per se violation of Sherman. Rather, the Court held that the aggrieved party must establish the traditional elements of a violation of Section 2, which include among other things, an analysis of the relevant markets, and an examination of the exclusionary power of the illegal patent claim.

Plaintiffs never seriously pressed the antitrust claim. Plaintiffs conducted the trial as a patent case, and not as an antitrust case. No hard evidence was received as to relevant geographic markets, the relevant product markets, or relevant customer markets. No evidence was received as to the degree of market control by defendants, or the degree of exclusion from the market of plaintiffs. On the basis of what was presented, I am restrained from finding in the plaintiffs' favor on their antitrust claims.

The Court finds that the patents[s] in suit are invalid and not infringed. Plaintiffs are awarded reasonable attorneys' fees against defendants and plaintiffs shall submit a fee schedule within 20 days. Plaintiffs shall also within that time prepare proposed findings of facts and conclusions of law consonant with this memorandum and said document shall include proposed findings supporting the award of fees. The previously filed proposed findings are rejected as argumentative.