**W. L. GORE & ASSOCIATES, INC., Plaintiff,**

v.

**OAK MATERIALS GROUP, INC., Defendant.**

Civ. A. No. 75–180.

United States District Court, D. Delaware.

Nov. 16, 1976.

E. A. Uebler of W. L. Gore & Associates, Inc., Newark, Del., for plaintiff; C. Walter Mortenson, Wilmington, Del., Marcus B. Finnegan, Brian G. Brunsvold of Finnegan, Henderson, Farabow & Garrett, Washington, D. C., of counsel.

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., for defendant; John B. Pegram of Davis, Hoxie, Faithful & Hapgood, New York City, of counsel.

CALEB M. WRIGHT, Senior District Judge.

Plaintiff, W. L. Gore & Associates, Inc.[1] filed this action against defendant Oak Materials Group, Inc. in 1975,[2] alleging infringement of its U. S. Patent Number 3,664,915 covering expanded, extruded, unsintered polytetrafluoroethylene ("PTFE") tape. Defendant answered, denying infringement and asserting affirmative defenses of invalidity, fraud and estoppel. In addition, defendant counterclaimed for a declaratory judgment of invalidity, non-infringement and unenforceability. In August, 1976, plaintiff formally disclaimed all claims of the subject patent in the Patent Office. Plaintiff subsequently filed a motion for voluntary dismissal under Rule 41(a)(2) Fed.R.Civ.P., with each party to bear its own costs. In response, defendant moved for entry of an order and judgment declaring the '915 patent to be invalid and awarding attorneys' fees and costs to defendant under 35 U.S.C. § 285. Both parties have submitted numerous documents and exhibits in support of their motions.

### I. Jurisdiction.

█ A preliminary jurisdictional question is raised by defendant's motion for a

---

1. W. L. Gore is the named inventor of the subject patent. He is also the founder and Chairman of the Board of plaintiff, W. L. Gore & Associates, Inc., which is the assignee of the application which matured into the subject patent. Hereinafter Mr. Gore will be referred to as "Gore"; the company, W. L. Gore & Associates, Inc. will be referred to as "Plaintiff".

2. This action was originally filed against defendant in the name of Dodge Industries, Inc. Because of a change in corporate name to Oak Materials Group, Inc., the parties stipulated to a change in the caption.

judgment of invalidity of the '915 patent. As plaintiff has formally disclaimed all claims of the patent, there is no longer a justiciable case or controversy before the Court with respect to the validity of any of those claims. Disclaimed claims cannot be revived, through reissue or otherwise. *Altoona Theatres v. Tri-Ergon Corp.*, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005 (1935). The patentee has no further right either to enforce the claims which have been disclaimed, or to obtain a reissue of any of those claims. Since all the claims have been disclaimed, the effect of plaintiff's action is the same as dedication of the patent to the public or abandonment. The Court, therefore, no longer has any jurisdiction with respect to the validity or invalidity of the patent. *See Chris-Craft Industries, Inc. v. Monsanto Co.*, 59 F.R.D. 282 (C.D.Calif.1973).

■ Under Rule 41(a)(2), the Court may grant dismissal "upon such terms and conditions as the court deems proper." Accordingly, the Court may retain jurisdiction for the purpose of awarding attorneys' fees. Defendant has requested an award of attorneys' fees and costs in the amount of $49,548.00 on the ground that the case is "exceptional" under 35 U.S.C. § 285. That section provides:

> The court in exceptional cases may award reasonable attorney fees to the prevailing party.

## II. Attorneys' Fees.

### A. Burden of Proof.

Ordinarily a request for attorneys' fees under § 285 is made after a trial on the merits, thus allowing the court to dispose of the request on the basis of a full record. The court is not precluded from awarding fees in its discretion, at the time it finds appropriate,[3] *Darlington v. Studebaker-*

*Packard Corp.*, 191 F.Supp. 438 (N.D.Ill. 1961), but it is necessarily more difficult for the court to exercise its discretion prior to trial, when the evidentiary record is far less complete. The burden of proof rests on the moving party. *See, Kastar, Inc. v. K Mart Enterprises, Inc.*, 190 U.S.P.Q. 550 (E.D.N. Y.1976). The question for the Court is how that burden of proof should be discharged, whether through an evidentiary hearing or through a less costly presentation of written evidence.

Public policy favors voluntary dismissals of actions. *Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc.*, 444 F.2d 490 (2d Cir. 1971). The Court is reluctant to put the parties to the expense and time of a lengthy evidentiary hearing on many of the issues which would have been brought out at a trial on the merits. Neither will the Court award fees solely on the basis of assertions and opinions by both parties, unsupported by facts in the record. In this action, both parties have provided the Court with a large number of exhibits, including documents and excerpts from depositions taken in related actions. Defendant accompanied its set of exhibits with proposed findings of fact. At the September 15th hearing, defendant explained that it was appropriate to present the facts to the Court in this form, as a quasi-summary judgment motion. If this were a motion for summary judgment, for the reasons hereinafter stated, this Court would deny the motion.

The Court has considered the exhibits compiled by both parties in order to determine whether defendant has established prima facie grounds for declaring the case to be "exceptional" under § 285. If defendant cannot establish a prima facie case, the motion for award of fees must be denied. If, on the other hand, a prima facie case can be established, both parties should be af-

---

**3.** The original language of § 285 provided for an award of fees after "entry of final judgment", indicating that fees could not be awarded if no final judgment were entered. That phrase was deleted in 1952. The statute now speaks only of the "prevailing party". Several courts have indicated that § 285 may be applied to cases which are dismissed under Rule 41(a)(2). *See, e. g., Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc.*, 444 F.2d 490 (2d Cir. 1971); *Kastar, Inc. v. K Mart Enterprises, Inc.*, 190 U.S.P.Q. 550 (E.D.N.Y. 1976); *Chris-Craft Industries, Inc. v. Monsanto Co.*, 59 F.R.D. 282 (C.D.Calif.1973).

forded the opportunity to take further discovery and, if needed, to present evidence at an adversary hearing.[4]

In determining the sufficiency of defendant's showing, the Court has considered that § 285 is meant to apply only to truly exceptional cases:

> The legislative history of § 285 indicates that Congress intended, even after trial, that it be used sparingly, . . . since it represents a departure from the usual rule that counsel fees are not awardable to the prevailing party in an action at law, . . . and the broad policy against allowing costs to be erected as an undue barrier to litigation. *Larchmont Engineering, supra,* at 491.

The policy behind the provision is not to reward further the prevailing party, but to compensate that party for costs which it would not have incurred but for the losing party's misconduct.[5] *Park-In Theatres, Inc. v. Perkins,* 190 F.2d 137 (9th Cir. 1951); *Mueller Brass Co. v. Reading Industries, Inc.,* 352 F.Supp. 1357 (E.D.Pa.1972). The courts should award fees only in the extraordinary case where necessary to prevent gross injustice:

> The exercise of discretion in favor of an allowance of attorneys' fees should be based upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of equal force, which makes it grossly unjust that the prevailing party be left to bear the burden of his own counsel fees.

*Purer & Co. v. Aktiebolaget Addo,* 410 F.2d 871, 880 (9th Cir. 1969).

*See also, Monolith Portland Midwest Co. v. Kaiser Aluminum & C. Corp.,* 407 F.2d 288 (9th Cir. 1969).

Where a case is dismissed prior to trial, an extremely heavy burden is placed on the moving party to establish entitlement to attorneys' fees, in light of the extraordinary nature of the relief. The Court finds, after careful consideration of all the evidence presented by both parties that defendant has failed to meet that burden.

### B. Background of Litigation.

The present case can be considered only against the background of two related actions involving the '915 patent. On October 3, 1969, Gore filed a patent application covering improvements in unsintered PTFE tape used as a pipe thread sealant. The patent was granted, after amendment,[6] on May 23, 1972. Claim I specified:

> A shaped article of an unsintered tetrafluoroethylene polymer which is uniaxially expanded and oriented, has a fibrillated structure and has a specific gravity of less than 1.4.

The day after the patent was granted, May 24, 1972, Johnson & Johnson ("J & J") filed a declaratory judgment action in this Court against W. L. Gore & Associates, Inc., alleging invalidity, unenforceability and non-infringement of the '915 patent. Extensive

---

**4.** This approach is in line with the reasoning of other courts. In *Larchmont Engineering, Inc., supra,* n. 2, defendants requested a hearing to permit them to present evidence developed through discovery which would bear on the question of bad faith. The Court found an insufficient showing of bad faith to warrant holding the requested hearing. On appeal, the Second Circuit affirmed. In the *Chris-Craft* case, *supra,* n. 2, defendant attempted to introduce the issue of fraud by amending the complaint to include the result in another action involving the same patent. Permission to amend the complaint was denied as the court did not feel it should incorporate findings from another case. The Court indicated, however, that it would have permitted the parties to hold an evidentiary hearing if they had so desired,

apparently on the basis of the finding of fraud in the other action.

**5.** Section 285 also incorporates a rationale similar to that of *Blonder-Tongue Labs, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)—the deterrence of coercive suits by owners of invalid patents.

**6.** The amendment added the words "uniaxially expanded and oriented" to the first claim, substituted "specific gravity" for "density" at several points in the application, and substituted the language "which does not retract along its length at normal temperatures" for "the length of which is stable" in claim 9. Applicant also agreed to drop prosecution of claims 10 and 11.

discovery was conducted by both parties in that litigation; much of the evidence relevant to this action was developed during discovery in the J & J action. A trial date of fall, 1976 was tentatively set, but both parties entered into a stipulation of dismissal following disclaimer of the '915 patent by Gore.[7] In August, 1972, during the pendency of the J & J action, plaintiff filed a complaint with the U. S. Tariff Commission (now the U. S. International Trade Commission) to prevent importation into the United States of certain PTFE tapes alleged to infringe the '915 patent. As part of its formal investigation into the complaint, the staff of the ITC considered evidence relevant to the validity of the '915 patent. The Administrative Law Judge who initially considered the complaint filed an opinion on February 4, 1976 recommending that the patent be found valid and enforceable. The full Commission entered a split decision on April 3, 1976 on the validity of the patent. Three judges found the patent invalid on the basis of a prior Russian specification, and the sale in the United States of an expanded unsintered PTFE tape more than one year prior to filing of the Gore application.[8] The other three judges concluded that the patent was valid, but refused to enter an order prohibiting importation of the tapes on the ground that no substantial injury had been proven. Plaintiff entered notice of an appeal from the Commission's decision, but has since stipulated to a dismissal.

Since the chronology of the three actions involving the '915 patent is crucial, the Court has prepared the following summary of the relevant dates:

| | |
|---|---|
| October 3, 1969 | Patent application filed |
| May 23, 1972 | '915 Patent granted |
| May 24, 1972 | J & J Complaint filed |
| August 29, 1972 | ITC Complaint filed |
| July 3, 1975 | Present action filed |
| February 4, 1976 | ITC Administrative Law Judge's Opinion filed |
| April 3, 1976 | Full ITC Opinion filed |

| | |
|---|---|
| August 16, 1976 | '915 Patent disclaimed |
| August 19, 1976 | Plaintiff's Motion for Dismissal Filed |

## C. Analysis.

 Attorneys' fees may be awarded under § 285 if the patentee obtained the patent through fraud on the Patent Office, or demonstrated bad faith in bringing and maintaining the action while knowing of the invalidity of the patents. Numerous courts have held that a decree of invalidity based on a finding of fraud makes the case exceptional within § 285. *CPC International, Inc. v. Standard Brands, Inc.*, 385 F.Supp. 1057 (D.Del.1974); *Farmer Bros. Co. v. Coca-Cola Co.*, 384 F.Supp. 595 (C.D. Calif.1974); *Chromalloy American Corp. v. Alloy Surfaces Co., Inc.*, 353 F.Supp. 429 (D.Del.1973). Conduct short of fraud, but in excess of simple negligence may also be an adequate foundation for an award of fees, if the prevailing party establishes a calculated recklessness about the truth or gross lack of diligence on the part of the losing party. *Monolith Portland Midwest Co. v. Kaiser Aluminum & C. Corp., supra; L. F. Strassheim Co. v. Gold Medal Folding Furniture Co.*, 477 F.2d 818 (7th Cir. 1973). The breach of duty to the Patent Office is relevant not only to the issue of fraud, but also to the good faith in maintaining a subsequent infringement suit. *Monolith Portland Midwest Co. v. Kaiser Aluminum & C. Corp., supra.* Similarly, a patentee who knows or reasonably should know that the patent is invalid on any other ground, but nevertheless sues an alleged infringer is guilty of bad faith. *Shelco, Inc. v. Dow Chemical Co.*, 466 F.2d 613 (7th Cir. 1972). If no fraud is involved, the key to the determination of bad faith is the reasonableness of the patentee's belief in the patent's validity:

> [O]nly where the court is convinced that the patent in suit is so wholly devoid of substance that that plaintiff could not have had a bona fide belief in its validity shall it award the defendant reasonable

---

7. By the terms of that dismissal, both parties bore their own costs.

8. The question of sale of this tape, known as the "Cropper" or "Ceelon" tape is discussed *infra*, at 707–708.

attorneys' fees pursuant to 35 U.S.C. § 285. *Indiana General Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 449 (S.D.N.Y. 1969).

### 1. *Fraud.*

At the September 15th hearing, this Court stated that no prima facie case of fraud had been made out by defendant. After a reconsideration of the record, the Court finds no reason to alter that conclusion. At most, defendant has established a prima facie case that Gore was negligent in failing to keep fully informed of information obtained by his employees and kept in the corporate files. It is impossible to detail fully all the evidence which the Court has considered, but a brief discussion of the most significant points is necessary.

Defendant's contentions with respect to fraud by Gore are twofold: that Gore knowingly misrepresented the state of the art in this patent application, and that the results of certain comparative tests performed by Gore's employees were not furnished to the Examiner.

In the '915 patent, Gore represented that, "It is surprising that unsintered poly(tetrafluoroethylene) ribbons can be expanded by stretching them." DX–A,[9] col. 6, lines 49–50. Oak contends that in the context of the application, "expanded" means "reduced in specific gravity", and that Gore was aware, or should have been aware of prior art which taught that the specific gravity of PTFE tape would be reduced by stretching. In support of its position, defendant offers a copy of a report by Robert C. Ribbans, II, published by the Plastics Department, Technical Services Lab., E. I. du Pont de Nemours and Co., Inc., on or about March 15, 1966, entitled "Unsintered Tape Manufacture Calendering Round Rods". It describes a process for making unsintered PTFE tape which includes stretching between two rollers driven at a differential

speed of approximately 20%. A copy of the report was obtained by plaintiff's employee, John Crowe, sometime in 1966. DX–G, p. 91. At that time, Crowe was responsible for development of a market for unsintered, extruded PTFE tape both for wire and cable insulation and for pipe thread sealant. DX–F, p. 6. The evidence does not establish that Gore saw the Ribbans' report prior to 1973 when a copy was produced from the company files during discovery in the J & J litigation.

As part of the application for the '915 patent, Gore included a table (Table IV) listing the properties of unsintered PTFE tapes in "commercial use" at the time. DX–B, p. 14. None of the tapes in Table IV, with the exception of the expanded Gore tapes, were reported to have a specific gravity of less than 1.4. Defendant contends that, at the time of filing of the application, plaintiff's files contained the results of tests run by its employees on other samples of PTFE tape which showed specific gravities of less than 1.4, but that those results were not revealed to the Patent Office. The exhibits before the Court do show that tests were run by an employee of Gore on the following tapes of 1.4 specific gravity or less:

1. Ceelon tape, tested June 12, 1969; specific gravity = 1.17 (DX–O, P)

2. Polychem tapes, tested December 18, 1968:
 Poly 760 – specific gravity = 1.4
 Poly 761 – specific gravity = 1.240
 Poly 761 (new) – specific gravity = 1.250
 (DX–U)

3. Anklon Thread Seal (Blue Pack), tested May 14, 1969; specific gravity = 1.40 (DX–V, W)

4. William Rose tape, tested August 11, 1969; specific gravity = 1.38 (DX–X)

With the possible exception of the three Polychem tapes, the results of these tests were apparently available to Crowe prior to filing of the patent application by Gore. *See* DX–F, G. The evidence is conflicting

---

**9.** In the remainder of the text, exhibits submitted by defendant in support of the motion for an order and judgment will be cited as DX–A, etc. Plaintiff's exhibits submitted in support of its motion and in opposition to defendant's motion will be cited as PX–A, etc.

as to when Crowe learned of the results of the Polychem tape tests. In his affidavit, Crowe states that he had no knowledge of the results until the documents were produced in June, 1976. Defendant asserts that the documents were produced in discovery at some unspecified time prior to June, 1975. The evidence indicates that the results of the Polychem tests were compiled by an employee in Crowe's department, either Jim Dauerty or Vipin Mehta. DX–G, pp. 82, 83. In any event, defendant has not established that Gore was personally aware of any of the test results prior to or during prosecution of the '915 patent application.

While defendant acknowledges that the present record does not establish actual knowledge on the part of the applicant Gore of either the Ribbans' report or the comparative tests, it contends that Gore should be held responsible for the knowledge of his employees. Courts have consistently held that fraud on the Patent Office must involve either a conscious intent to defraud or a recklessness indicating a disregard for the duty of frankness. *In re Multidistrict Litigation Involving Frost Patent,* 540 F.2d 601 (3 Cir. 1976); *Xerox Corp. v. Dennison Manufacturing Co.,* 322 F.Supp. 963 (S.D.N.Y.1971); *Norton v. Curtiss,* 433 F.2d 779, 57 CCPA 1384 (1970) ("misrepresentations were made in an atmosphere of gross negligence as to their truth"); *Corning Glass Works v. Anchor Hocking Glass Corp.,* 253 F.Supp. 461 (D.Del.1966) ("intentional misrepresentation"); *Mayview Corp. v. Rodstein,* 385 F.Supp. 1122, 1126 (C.D. Calif.1974) ("intent to deceive or at most a reckless disregard of the consequences").

Defendant has not presented the Court with any evidence establishing an intentional non-disclosure or misrepresentation by Gore. Nor has a case of gross negligence been made out. The testimony by both Crowe and Gore, while somewhat self-serving, does indicate that Crowe's comparative testing operation was run independently of Gore. The program and records were not particularly systematized. Crowe Affidavit, ¶ 5. There was no procedure established for collecting tapes to be tested, or for transmitting the test results and. other information to other personnel in the company. DX–F, p. 7; DX–G, pp. 73–75. The primary purpose of the information-gathering was to keep track of the progress of competitive manufacturers in the field, rather than to compile evidence related to future patent applications. DX–G, p. 14. Gore apparently did not encourage the routine transfer of such information within his company, or else the documentary evidence of low density tapes probably would have come to his attention sooner. The Court cannot say, however, that Gore evidenced any reckless disregard for the truth, since he had been assured by Crowe on several occasions that the tapes being tested were all of "standard density." DX–G, pp. 76, 77. Perhaps it was negligent not to check up on the test results, but it was not so grossly negligent as to border on fraud. Simple negligence on the part of the losing party, without more, does not make the case exceptional under § 285.

The Court considers that, on the basis of the record before it, the facts of this case are distinguishable from those in *Monolith Portland Cement, supra* and *L. F. Strassheim, supra.* In each of those cases, the Court found that the losing party's conduct came very close to fraud; the only element which could not be supported by the evidence was an actual intent to deceive. The present case is closer to *Kastar, Inc. v. K Mart Enterprises, supra.* In that case, the court found that the attorney's failure to investigate more fully the date of first sale was, at most, "reasonably negligent".

This does not mean, however, that an employer may never be held responsible for the knowledge of his employees relevant to the prosecution of a patent application. If a patentee purposefully insulates himself from those employees responsible for research and development in order to avoid possible penalties for fraud, the court might well find a "reckless disregard for the truth" which justifies an award of attorneys' fees. The line between simple and gross negligence is obviously difficult to draw. It is even more difficult in a case

such as this, where no trial has been held. On the basis of the record provided in support of the current motions, the Court must conclude that there is no prima facie case of fraud or gross negligence. This conclusion should not be taken, however, as placing this Court's imprimatur on all of plaintiff's actions. As the court pointed out in *Mueller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357, 1382 (E.D.Pa.1972), "Hopefully, the plaintiff and its attorneys will be more careful in the future in insuring that the circumstances surrounding their actions are not at all even suggestive of impropriety."

### 2. Bad Faith.

Since no case of fraud has been made out, defendant cannot contend that plaintiff filed this suit knowing that the patent was obtained by fraud. The question remains, however, whether bad faith can be imputed to plaintiff on the basis of subsequently discovered information relating to the validity of the patent. Defendant contends that, even if Gore had no personal knowledge of the above evidence at the time of the application, he learned of that evidence prior to filing of this suit as a result of proceedings in the J & J action. Assuming that the evidence available to Gore prior to July 3, 1975 clearly establishes the invalidity of the '915 patent, defendant argues that the filing of this suit constitutes bad faith.

Defendant bears a double burden of proof with respect to the issue of bad faith under the present case law. First, defendant must establish a prima facie case that the patent is invalid on one or more of the grounds set out in 35 U.S.C. § 102. A determination by this Court that the patent is probably invalid, without more, however, would not establish bad faith on the part of plaintiff. Second, defendant must show that the patentee could not reasonably have believed in the validity of the patent, even if the probable result of litigation would be a decree of invalidity. While defendant has

cast substantial doubt on the validity of the '915 patent, the Court cannot conclude that Gore was guilty of bad faith in bringing this action. Gore has consistently maintained that he believes the patent to be valid, despite all of the prior art which has been brought to his attention. His decision to disclaim the patent and to move for dismissal of this suit was, by his admission, a "business decision", based on an evaluation by Gore and his attorneys of the cost of litigation and the probability of success.[10] Although the Court feels that Gore's belief may be based on a misapprehension of the present state of the law, defendant has failed to demonstrate that the patent is so wholly devoid of substance that the patentee could not have had a bona fide belief in its validity.

Apparently defendant is contending that the patent is invalid on the basis of prior art. The strongest evidence which Oak relies on in support of that theory is the "Ceelon" or "Cropper" tape manufactured by John Cropper of New Zealand. According to Cropper's deposition in the J & J action, between 1966 and 1969, he produced a PTFE tape with a process which included stretching the tape on heated rollers. DX–I, p. 21. Cropper did not ever measure the specific gravity of the tape in question, DX–I p. 54, but tests were performed by du Pont in 1968 which indicated that the tape had a specific gravity of between 1.24 and 1.39. DX–J. In 1968, Cropper sent, without charge, 70 sample rolls of the tape to the Budd Company of Newark, Delaware. DX–I, p. 2; DX–K. There is evidence in the record to suggest that an additional 25 rolls of similar tape, but with slightly different dimensions, were ordered by Budd and were paid for prior to October 3, 1969. DX–I, p. 50; DX–L, M. Crowe obtained a sample roll of the Cropper tape, labelled "Ceelon" from the Crane Packing Co., a customer of plaintiff who had been contacted by Budd. DX–G, pp. 79–80. That Ceelon tape was tested in the Gore labs and

---

10. Since Gore has never detailed the factors which shaped his business decision, the Court has had to draw inferences from the evidence before it as to the reasonableness of his possible motivation.

found to have a specific gravity of 1.17. DX–O. It is not at all clear whether the Ceelon tape tested in the Gore labs was a sample of the original 70 rolls shipped to Budd for testing and analysis, or part of the later 25 roll shipment which was allegedly sold to Budd by Cropper. Defendant has not produced any evidence suggesting that the sample tested came from the 25 roll shipment. Crowe has testified that he did not know the exact origin of the Ceelon tape, but that it was his impression at the time that Cropper was not a supplier in the U.S. DX–G, p. 78. Because defendant has failed to offer any proof to the contrary, the Court must assume that the Ceelon tape tested in the Gore labs came from the sample 70 rolls sent to Budd in 1968.

Under 35 U.S.C. § 102, defendant must demonstrate that the product was "on sale" in the U.S. more than one year prior to the date of the application for the Gore patent. Defendant contends that the order from Budd for 25 additional rolls of the Cropper tape is sufficient to establish sale in this country. In view of the proceedings before the International Trade Commission, the question of sale is a close one. The Administrative Law Judge and half of the full Commission board found the Gore patent to be valid on the ground, *inter alia*, that no "sale" of Cropper tape had taken place in the U.S. Further, it is not at all clear that any of the 25 rolls were ever tested for specific gravity. As discussed above, the Court must assume for purposes of these motions that the tests run on the Cropper tape were all performed on the original 70 rolls. As the calendering was changed for the second set of rolls, the Court cannot conclude without expert testimony that those particular rolls anticipated the Gore patent, even if they were "sold" more than a year prior to the Gore application. Gore's belief in the patentability of the '915 patent over the Cropper tape was therefore not so unreasonable or devoid of merit as to justify an award of attorneys' fees.

The other evidence relied on by defendant similarly does not support a prima facie case of bad faith. The Ribbans' report discussed *supra* teaches only stretching of the PTFE tape. It does not teach any expansion by heating to minimize retraction; nor does it clearly indicate that specific gravity may be reduced merely by stretching. Ribbans' conclusions with respect to specific gravity indicate only that specific gravity may be reduced by the use of lubricant fillers—a technique which was discussed in the '915 patent. In subsequent testimony, Ribbans stated that tape produced according to the method outlined in this report would have a specific gravity "in the range" of 1.5. PX–G.

The only other evidence presented by defendant are the reports on specific gravity of the Polychem, Anklon and William Rose tapes, listed *supra*. Both Crowe and Gore have submitted sworn statements indicating that neither was aware of the reports on the Polychem tapes prior to 1976. *See* affidavits of Gore and Crowe. Defendant has asserted that the documents were discovered several years ago, but has offered no proof in support of that assertion. Even if Gore had been aware of the data prior to filing of this suit, however, the Court could not conclude that he acted in bad faith. Defendant has argued that the '915 patent includes any extruded PTFE tape with a specific gravity of less than 1.4, and that consequently Gore should have known that the patent was invalid immediately upon discovering the prior existence of three low specific gravity tapes. The Court does not need to determine, on these motions, whether defendant's interpretation of the language of the patent is correct. All that must be determined is whether Gore could have maintained a reasonable belief in the validity of the patent even after discovering the evidence of other low specific gravity tapes. After considering the patent as a whole, the Court cannot conclude that Gore's belief was unreasonable. Although the language of the abstract does define "expanded" as "reduced in specific gravity", the remainder of the patent speaks only of expansion through application of heat during or immediately after stretching of the tape. Gore acknowledges in the patent that specific gravity may also be re-

duced below 1.4 by the use of lubricant fillers, but indicates that tapes produced by that method are not disclosed by the claims of the patent. It is not clear on the face of the patent that the crucial feature is the reduction in specific gravity below 1.4. Gore could therefore reasonably have understood the language of the '915 patent as including only PTFE tapes which had been stretched with the application of heat, so that the resultant specific gravity was less than 1.4. The reports on the Polychem tapes give no indication of how the tapes were processed, whether through simple stretching, expansion within the meaning of the '915 patent, or use of fillers. Nor is there any information as to whether the tapes were produced under a prior patent or, if not, whether they had been "on sale" in the U.S. for more than one year prior to filing of the '915 patent application. Defendant has not suggested that Gore had any independent information on the nature or origin of these tapes other than the reports produced in the J & J litigation. Accordingly, the Court finds that defendant has failed to make out a case of bad faith.

Similarly, the reports on the Anklon Blue Seal and William Rose tapes are not determinative. The specific gravity of the Anklon Tape is listed as 1.4, which is the threshold figure specified in the '915 patent. According to testimony of Crowe, the William Rose Tape was of British origin; there is no evidence as to whether either tape was expanded, or whether the tapes had been sold in the U.S. prior to filing of the '915 application. Defendant has failed to establish that any of the tapes anticipated the Gore patent under § 102, and that Gore therefore could not reasonably have believed in the validity of the '915 patent.

The Court does not mean to suggest that the '915 patent would have been found valid after a full trial. The evidence before the Court casts severe doubt on its validity. The evidence does not establish a prima facie case, however, that Gore acted in bad faith in bringing the present suit. Although the invention may not have been patentable, it did represent a useful innova-

tion in the field which enjoyed substantial commercial success. The court in *Indiana General Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 449 (S.D.N.Y.1969) refused to find bad faith in a similar case:

> In the present case, although the plaintiff was, in the opinion of this Court, somewhat less than candid in its relations with the Patent Office, and in spite of the fact that this Court found, among other reasons plaintiff's patent invalid for "obviousness", plaintiff's claim represents an inventive advance which, although not worthy of patent protection, is sufficient to support a bona fide belief in the patent's validity, thereby removing plaintiff from the shadows of bad faith.

An award of attorneys' fees under § 285 is intended to compensate the prevailing party for costs incurred because of inequitable conduct on the part of the losing party. Defendant has failed to meet its burden of demonstrating a prima facie case of inequitable conduct on the part of plaintiff. No additional evidentiary hearing is warranted by the record before the Court. Accordingly, the action is dismissed pursuant to Rule 41(a)(2), with costs and expenses to be borne by each party.

### III. *Protective Orders.*

■ As part of its motion for an order and judgment, defendant has asked the Court to direct the plaintiff to retain in safekeeping any documents or information which refer or relate to stretching of tetrafluoroethylene polymer or products made by stretching polyfluoroethylene polymer. Defendant fears that it will again face litigation with plaintiff involving substantially the same facts and issues as were involved in the present action, since plaintiff is presently prosecuting process claims in a patent application that is a divisional application of the one which matured into the '915 patent. Further, defendant alleges upon information and belief that plaintiff has other patents and patent applications directed to the stretching of unsintered PTFE tape which it may seek to enforce against defendant.

The Court refuses to grant defendant's request on two grounds. First, defendant has not shown the Court that there is any danger that the information will not be available, through discovery, in any later action. Unless there were a real danger that relevant information would be lost or destroyed in the interim, it is inappropriate to enter a protective order with respect to possible future actions. Second, plaintiff has offered to allow representatives of defendant free access to the files at the mutual convenience of both parties, in order that defendant may copy or otherwise record any documents which it feels might be relevant to a future action. This solution seems reasonable, in light of the burden which would be placed on the record-keeping system of plaintiff if the Court were to direct retention of documents.

Defendant has additionally requested that certain documents and information which had been designated as confidential for the purposes of this litigation be removed from the restrictions of the protective order. Since plaintiff has not objected, the Court sees no reason why those documents should not be removed from the order.

Submit order.