**GILBRETH INTERNATIONAL CORPORATION**

v.

**LIONEL LEISURE, INC., F.W. Woolworth Company, Gaudio Brothers, Inc. and S.S. Kresge Company.**

**Civ. A. Nos. 76–3494, 76–3555 and 76–3438.**

United States District Court, E.D. Pennsylvania.

Aug. 25, 1983.

Stanley H. Cohen, Philadelphia, Pa., for plaintiff.

Michael A. Cornman, New York City, Wallace D. Newcomb, Philadelphia, Pa., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In this patent infringement litigation, Gilbreth International Corporation ("Gilbreth") the plaintiff, having been unsuccessful in reissue litigation before the United States Court of Customs and Patent Appeals, has filed a motion pursuant to Fed.R.Civ.P. 41(a) seeking a voluntarily dismissal with prejudice of its complaint against the defendants. The defendants have urged that the Court exercise its authority under Rule 41(a) to dismiss a claim at plaintiff's request only "upon such terms and conditions as the court deems proper" and enter an Order dismissing plaintiff's complaint with prejudice but awarding attorney's fees and costs to the defendants under the "exceptional case" provision of 35 U.S.C. § 285. A hearing was held on these motions. For the reasons hereinafter set forth, the Court will enter an order permitting plaintiff's complaint to be voluntarily dismissed with prejudice upon the condition that plaintiff pay to defendants all reasonable attorney's fees and costs incurred in connection with this litigation. On or before September 30, 1983, defendants shall submit an applica-

tion for attorney's fees in accordance with the standards hereinafter set forth.

Gilbreth filed these three actions in 1976 claiming that the defendants infringed a patent issued to the plaintiff in 1974. The patent in question was a band of heat-shrinkable plastic containing a decorative pattern which could be quickly placed upon objects such as Christmas tree ornaments, Easter eggs and glassware in order to decorate the objects or, in the case of glassware, to seal the objects. These three cases were consolidated and originally assigned to the late Judge Gorbey but were subsequently transferred to this Court. Gilbreth later filed a motion to stay these actions because it had initiated reissue application proceedings with the United States Patent and Trademark Office ("Patent Office"). The Court granted this motion in its Memorandum of December 10, 1980 and stayed the proceedings. An extension of the stay was later granted so that Gilbreth could appeal the Patent Office's reissue determination which had in effect invalidated the Gilbreth patent. The Patent Office's invalidation of the Gilbreth patent was affirmed by the Board of Patent Appeals and was also affirmed by the Court of Customs and Patent Appeals.

The reissue procedure was adopted by the Patent Office in 1977 *see* 37 C.F.R. § 171, *et seq.* (1980). It permits a patent owner to seek a relatively inexpensive post-issuance ruling from the Patent Office regarding the pertinence of patentability evidence not previously considered by the Patent Office during the examination of the original patent. As part of the reissue proceeding the Patent Office invites comment from interested members of the public, to which the defendants responded, giving reissue proceedings in general and the reissue proceedings in this case in particular many characteristics of an adversary proceeding.

Prior to the stay of the proceedings in this matter, the defendants had filed a motion for summary judgment contending that the patent held by Gilbreth was invalid because (1) it was known or used by others in this country or described in a printed publication prior to the alleged invention thereof (35 U.S.C. § 102(a)); (2) it was described in a printed publication or on sale in this country more than one year prior to the plaintiff's application to the Patent Office for said patent (35 U.S.C. § 102(b)); and (3) the inventors did not invent the subject matter sought to be patented, *id.* § 102(f). The defendants further contended that the plaintiff's conduct constituted a breach of its duty of candor to the Patent Office, and requested costs and attorney's fees from the plaintiff. In support of their motion for summary judgment, the defendants attached exhibits from the plaintiff's files and called the Court's attention to pages of deposition testimony of the plaintiff and its customers.

The issues raised by the defendants in their summary judgment motion are virtually identical to those considered by the Patent Office. This similarity was a factor in the Court's decision to stay the proceedings pending resolution of the reissue proceedings. *See* Memorandum of December 10, 1980 at 5. As the Court noted in its Memorandum, "[t]he plaintiff has represented to the Court that if it fails in obtaining a reissue patent it will move to dismiss these actions with prejudice." *Id.* at 5. The Patent Office subsequently found the Gilbreth Patent (U.S. Patent No. 3,829,348) invalid. This decision was affirmed by the Board of Patent Appeals (a review board within the Patent Office) and by the United States Court of Customs and Patent Appeals ("CCPA"), an Article III Court to which an unsuccessful reissue applicant can appeal an adverse decision of the Patent Office and the Appeals Board. The 1982 Federal Courts Improvement Act subsequently consolidated the CCPA and the United States Court of Claims into the U.S. Court of Appeals for the Federal Circuit, (*see* 28 U.S.C. § 1295(a)(1)), a new federal Court of Appeals which hears appeals from district court decisions involving federal question jurisdiction over patent questions under 28 U.S.C. § 1338.

After the CCPA affirmed the Patent Office denial of reissue, Gilbreth's counsel, as previously represented, moved to dedicate the patent to the public and sought an Order of this Court permitting plaintiff to voluntarily dismiss this litigation with prejudice. The defendants urged that this Court grant a voluntary dismissal with prejudice only upon the condition that plaintiff compensate defendants for their reasonable attorney's fees and costs in connection with this litigation. As authority for this condition, the defendants cited the "exceptional case" provision (35 U.S.C. § 285) of the U.S. Patent Code. This Section provides that the court "in exceptional cases may award reasonable attorney fees to the prevailing party." Most cases awarding fees under this section have involved fraud on the Patent Office or the Court, but authority exists for awarding fees where there has been grossly negligent or reckless conduct or bad faith conduct in connection with either the obtaining of a patent or the federal court litigation or both. *See* pp. 615–617, *infra*. To determine whether there has been any such conduct justifying the award of fees to the defendants who are clearly the prevailing party in the reissue litigation and would probably prevail on the merits in the instant litigation under the principles of res judicata and collateral estoppel, this Court held an evidentiary hearing. Based on the evidence presented at the hearing and the record in this matter, the Court finds by clear and convincing evidence that Gilbreth's conduct in the procurement of the patent was fraud upon the Patent Office and was so reckless and tainted by bad faith that the defendants are entitled to a reasonable attorney's fee in connection with their defense of Gilbreth's suit against them. This Court has further determined that Gilbreth failed to disclose material facts to the Patent Office when it sought and obtained the patent. This conduct, though it does not amount to common law fraud, is a fraud on the Patent Office within the meaning of the cases interpreting 35 U.S.C. § 285.

*The Background of U.S. Patent No. 3,829,-348*

On April 7, 1972, Gilbreth applied for a patent on the heat shrinkable bands at issue in this case. On August 13, 1974, the U.S. Patent Office issued the patent. The heat shrinkable bands are designed to be offered in various sizes and shapes and to be placed around various objects such as Christmas ornaments, Easter eggs, and glassware. The band is placed in the desired position around the object and heat is then applied to the band. After a few seconds of applied heat, the band shrinks around the object in a tight fit achieving, in the language of Gilbreth's patent application, "intimate contact with the surface area" of the object. When heat ceases to be applied, the shrinkage stops. The bands are capable of shrinking as much as 2 to 10 percent in height and 30 to 50 percent in diameter. Therefore, the band applied to the object must be somewhat proportional in size to the object over which the band is being shrunk. The degree of heat required is not great. The heat from an ordinary hair blow dryer will usually suffice to trigger the shrinking of the band.

In its patent application, Gilbreth focused on the band's potential usefulness in decorating Christmas tree ornaments. However the patent application was broadly worded and indicated that the patent applicants (Jacob Spiegel, an owner and officer of Gilbreth, and Albert Miller, a Gilbreth researcher) believed the band to be capable of use with a variety of different objects. In the patent application's "abstract" or description of the "invention" they described the invention as follows:

> A method of decorating objects rapidly is provided. A band of heat-shrinkable plastic is provided with a decorative pattern and is placed on the object. Heat is applied to the band causing it to shrink and conform to the shape of the object being decorated.

(Defendant's Ex. 3). Furthermore, the patent application specifically discussed the possibility of applying the heat shrinkable

bands to glass and plastic containers. *See* Def. Ex. 3 at 9–10.

On Page 15 of the patent application, applicants Spiegel and Miller, acting on behalf of Gilbreth, each signed the standard "Declaration, Power of Attorney, and Petition" which is a part of all patent applications. In this Declaration, Spiegel and Miller stated:

> [W]e believe we are the original, first, and joint inventors of the invention in METHOD OF DECORATING OBJECTS described and claimed therein [the patent application claims section]; that we do not know and do not believe that this invention was ever known or used before our invention thereof, or patented or described in any printed publication in any country before our invention thereof, or more than one year prior to this application; or in public use or on sale in the United States more than one year prior to this application ... except as follows: NONE....

> * * * * * *

> The undersigned petitioners declare further that all statements made herein of their own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereupon.

(Defendants Ex. 3 at 15) (emphasis added.)

Thus, Spiegel and Miller, acting for Gilbreth, had sworn an oath averring that the heat shrinkable bands were new, unknown, not described in industry or other publications, and not in use or on sale anywhere in the United States prior to April 6, 1971, the date one year and one day before they filed the patent application which resulted in the issuing of U.S. Patent No. 3,829,348.

The Patent Office requires such a declaration in applications because federal patent law does not allow the issuance of a patent for inventions (no matter how useful) if the object or process to be patented was known, in use, or on sale in the country more than one year prior to the application for the patent. Specifically, 35 U.S.C. § 102 provides that a person shall not be entitled to a patent if:

> (a) the invention was known or used by others in this country or patented or described in a printed publication in this or a foreign country before the invention thereof by the applicant for patent, or (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country more than one year prior to the date of the application for patent in the United States....

Another important provision of the patent code provides that an idea, product, or process can not be patented if it results only from an obvious fine-tuning of existing technology which could have been accomplished by someone of ordinary skill in the particular field. Specifically, 35 U.S.C. § 103 states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Throughout this litigation the defendants have contended that the Gilbreth patent was invalid because the heat shrinkable band was described in print, in use and on sale prior to April 6, 1971 and because the patented band, even if slightly different from the bands on sale before 1971, was only an obvious improvement in the pre-1971 technology within the meaning of 35 U.S.C. § 103, no matter how much better the patented band fits the objects upon

which it is placed. Furthermore, the defendants argued that Gilbreth was well aware of these statutory bars to patentability because Gilbreth itself was the entity which used and sold the pre-1971 heat shrinkable bands and performed the "obvious" improvements to the pre-1971 bands. Because Gilbreth knew or should have known of these bars to patentability, the defendants contend that Gilbreth applied for the patent as the result of either fraud, bad faith, reckless conduct, gross negligence, or all of these things.

For these reasons, the defendants participated in the reissue litigation begun by Gilbreth and succeeded in having Patent No. 3,829,348 declared invalid by the Patent Office, the Board of Patent Appeals, and the Court of Customs and Patent Appeals. It was only after the adjudication of the reissue application that Gilbreth dedicated the patent (which it had held since August 13, 1974) to the public and sought to dismiss its litigation against the defendants (which began in 1976). The defendants contend that Gilbreth abused the judicial system and the patent system either intentionally, through recklessness or through bad faith conduct, when it obtained a patent that the Patent Office ruled it would never had granted had Spiegel and Miller disclosed to the Patent Office facts well-known to Gilbreth. Furthermore, contend the defendants, Gilbreth exacerbated its inequitable conduct by filing the instant lawsuits which alleged that the defendants had infringed upon a patent that Gilbreth obtained by reckless or bad faith. Defendants therefore point out that Gilbreth has unclean hands in the litigation and that an award of attorney's fees under 35 U.S.C. § 285 is therefore warranted on this basis alone. Thus, the defendants have asked that this Court grant Gilbreth's Rule 41(a)(2) motion to dismiss only upon the condition that Gilbreth pay to the defendants a reasonable attorney's fee to compensate them for the expense of defending Gilbreth's baseless charge of infringement and for participating in the reissue application proceedings which resulted in the Patent Office's rejection of the patent.

Based on the evidence presented at the January hearing, it is apparent that the once-patented band was sold by Gilbreth more than one year before April 6, 1971. Gilbreth sold the bands to Bradford Novelty Company, a manufacturer of Christmas ornaments, and to Guerlain, a perfume manufacturer, during the 1960s. Gilbreth also offered the bands for sale to Bradford and to Innova, manufacturers of ornaments, in 1970. It is also clear that Gilbreth was marketing during the 1960s and early 1970s a heat shrinkable band that was used for binding objects. One of Gilbreth's own publications in 1970 illustrated how its heat shrinkable material (named "G–030") could be used to affix free samples to merchandise offered for sale. The Patent Office and the CCPA found, as does this Court, that the adaptation of the heat shrink bands from binding objects together to fitting on ornaments for decoration was a modification of the product that was obvious to a person of ordinary skill in this field. The Patent Office also found, as does this Court, that the heat shrinkable bands were offered for sale more than one year prior to Gilbreth's patent application. The Patent Office found, as does this Court, that the heat shrinkable bands were described in printed publications and well known prior to Gilbreth's patent application. Therefore, the evidence of Gilbreth's own activities shows the patent to have been illegally obtained. Furthermore, Gilbreth should have known that it was barred from patenting the heat shrinkable bands and should have known that commencing suit against the defendants in this action amounted to bad faith.

In 1966, Gilbreth was contacted by officials of Bradford Novelty. Bradford sought to purchase from Gilbreth heat shrinkable bands which could be placed on ornaments manufactured by Bradford. In fact, Bradford's president, Jack Burnbaum, suggested this use to Gilbreth, which he knew to be in the business of selling plastics and labels. On December 1, 1966, Bradford ordered 40,000 such bands, which Gilbreth provided. At the hearing, Gil-

breth executive Jacob Spiegel testified that the bands had not shrunk to fit the ornaments as well as had been hoped. The edges of the bands in particular were not in as smooth an intimate contact with the ornament surface area as he had hoped. The phenomenon is termed "scalding" in the jargon of the trade. The bands were also subject to peeling. Perhaps because of this trait, Bradford did not use all 40,000 bands on 40,000 ornaments, but shelved momentarily the idea of using the bands to decorate its ornaments. Nevertheless, the Gilbreth heat shrinkable bands designed for use to decorate Christmas ornaments, were clearly "on sale" within the meaning of 35 U.S.C. § 102(a) in this country years prior to Gilbreth's patent application. The evidence presented at the hearing also showed that Gilbreth was attempting to sell the heat shrinkable bands in Japan throughout 1966 and 1967 (see Defendant's Exs. 16–37).

In 1969, Gilbreth and Bradford briefly revived the idea of decorating Bradford Christmas tree ornaments with Gilbreth heat shrinkable bands. Gilbreth offered 100,000 bands for sale to Bradford. Bradford, however, determined that the heat shrinkable bands were still not smooth enough when applied to the Christmas tree bulbs and did not begin marketing a bulb decorated by the Gilbreth bands. Despite Bradford's dissatisfaction with the appearance of the Gilbreth shrinkable bands on the Bradford ornament, there can be no doubt that the bands were on sale well prior to April 6, 1971, the date one year prior to Gilbreth's patent application. Somehow Gilbreth, which had been involved in marketing the bands for nearly a decade prior to the patent application, did not disclose these activities to the Patent Office. As heretofore noted, Messrs. Jack Spiegel and Albert Miller, the purported inventors of the heat shrinkable band, signed at the bottom of their patent application a declaration that the bands had not been on sale in this country more than one year prior to the application. The patent application declaration served as a stark reminder to the Gilbreth officials that such

dealings are material and should have been disclosed. It defies logic and credulity for the plaintiff to contend that it could have negligently forgotten to mention these dealings to the Patent Office. Furthermore, events subsequent to the filing of the patent application gave Gilbreth ample opportunity to inform the Patent Office of the many material facts which ultimately resulted in the invalidation of the wrongfully obtained Gilbreth patent. Gilbreth never availed itself of these opportunities but continued to contend that it held a valid patent and in fact went so far as to sue the defendants on the basis of this invalid patent. It was only through the efforts of the defendants, at a cost of many years of time and money, that the true facts surrounding the patentability of the heat shrinkable bands have emerged. Under these circumstances, this Court is compelled to exercise its discretion to award attorney's fees pursuant to 35 U.S.C. § 285.

Correspondence between Bradford and Gilbreth subsequent to the patent application illustrates the bad faith that has characterized Gilbreth's conduct toward the Patent Office, its former customers, and its opponents in this litigation. On May 1, 1973, Jack Burnbaum, the President of Bradford Novelty, wrote to William Spiegel, President of Gilbreth. In his letter Burnbaum accused Gilbreth of stealing his idea (of placing the heat shrink bands on Christmas tree ornaments) and using it to sell Gilbreth bands to other manufacturers of tree ornaments. In particular, Burnbaum was objecting to the sale of Gilbreth bands to Corning Glass (*see* Def.Ex. 68). Upon receipt of Burnbaum's letter, Gilbreth contacted its legal counsel, a law firm specializing in patents, trademarks, and copyright law, and arranged for counsel to formulate a reply to Burnbaum's allegations. Gilbreth subsequently wrote Burnbaum and denied any wrongdoing contending that Corning had approached Gilbreth because of Gilbreth's known use of heat shrink bands on other products and that no agreement between Bradford and Gilbreth was violated by Gilbreth's sales to

Corning. In this letter of May 4, 1973, William Spiegel stated:

We [Gilbreth] were approached by the ornament company to work with them to develop their ideas. That which is being supplied to your competitor has been produced using techniques completely different from anything suggested, presented, or considered by your company [Bradford]. *As a matter of fact, the history of decorating objects with printed shrink bands precedes the time [1966] of our activities with your company.*

(Def.Ex. 70) (emphasis added).

Thereafter, Bradford retained counsel who sent to Gilbreth a letter dated May 15, 1973, wherein Bradford requested information as to whether Gilbreth had ever sought a patent for "the decorated shrink heat sealed bands for articles such as Christmas balls") (Def.Ex. 71). Bradford's counsel further stated that the company was prepared, of course, to assert our rights to this product and the gains derived from it. Gilbreth again referred the matter to its counsel, which sent a letter dated June 15, 1973 to Bradford's counsel stating it would respond to Bradford's request upon gathering sufficient information to do so. On August 29, 1973, Bradford's counsel again wrote to Gilbreth's counsel, objecting to the continued delay in obtaining a response from Gilbreth. Bradford's counsel stated that he had "advised my client that steps are justified in starting suit against the exclusive license of Mr. Spiegel's and Gilbreth Company" (Def.Ex. 77). On September 18, 1973, Gilbreth's counsel responded to Bradford's counsel saying:

Our client's [Gilbreth's] records indicate that prior to any contact by the Gilbreth Company with Bradford Novelty Co. or by Bradford Novelty Co. with Gilbreth Company, *it was already known at Gilbreth Company that heat shrinkable bands could be used for decorating all types of round, cylindrical, ellipsoidal and spherical objects, as well as irregularly shaped but rounded objects.*

\* \* \* \* \* \*

*It was not until after Gilbreth Company had made known to the industry the availability of imprinted heat shrinkable bands that Mr. Burnbaum or anyone else contacted Gilbreth Company.... Gilbreth Company merely provided samples of its already existing products for use by Bradford Novelty Co.*

(Def.Ex. 80) (Emphasis added). The letter went on to state that on August 20, 1971, Corning had approached Gilbreth regarding the possible use of the already long-existing PVC (polyvinyl chloride) heat shrinkable bands to decorate Christmas ornaments.

On September 19, 1973, just one day after this letter was sent, Gilbreth President William Spiegel wrote to Gilbreth's counsel acknowledging the receipt of his copy of the letter and stated:

[W]e [Gilbreth] consider [the letter to Bradford] quite good, and reflecting the actual situation.

I am hopeful, however, that nothing contained in that letter will negate our rights to a patent since it seems to indicate that products that we are supplying for decorating cylindrical objects is a version of that which was submitted to and considered by Bradford Novelty Co. (in 1966 and 1969).

(Def.Ex. 81). Subsequently, the Patent Office held that the Bradford transactions were grounds for invalidating the Gilbreth patent pursuant to 35 U.S.C. §§ 102(a) and 102(b). This correspondence underscores the fact that Gilbreth was aware that the validity of its patent was at the very least open to serious question because of the Bradford transactions. Gilbreth, however, failed to disclose any of this material information to the Patent Office. Gilbreth's conduct obviously misled the Patent Office. Gilbreth's conduct in failing to disclose constituted bad faith and grossly wanton and reckless conduct. The egregiousness of Gilbreth's failure to inform the Patent Of-

fice of the very material Bradford dealings makes this case exceptional within the meaning of 35 U.S.C. § 285.

As heretofore noted, Gilbreth was not only marketing its heat shrinkable bands to Bradford for use in decorative ornaments, it was also selling these bands to Guerlain, a french perfume manufacturer, for use in decoratively binding the spherical perfume bottle caps to the perfume bottle. (*See* Def.Ex. 15.) The top of the Guerlain cap closely resembles a round Christmas tree ornament. In 1967, Gilbreth shipped 57,-000 of these bands to Guerlain (*see* Def.Ex. 11) and Guerlain successfully used the bands around the perfume bottle cap. Defendant's Exhibit 15, a Guerlain perfume bottle and cap sealed and decorated by a Gilbreth heat shrinkable band shows that the band was working very well in 1967. The band is in intimate contact with the surface area of the round cap. There is no scalding or peeling around the edges of the band, even though many years have passed since the band was originally placed upon the Guerlain perfume bottle. In 1967, Gilbreth possessed and commercially used a technology for which it sought a patent in 1972. Nevertheless, Gilbreth did not disclose these earlier transactions to the Patent Office. Gilbreth's conduct in this regard was bad faith and was grossly reckless conduct. Gilbreth's failure to inform the Patent Office of the Guerlain transactions makes this an exceptional case within the meaning of 35 U.S.C. § 285.

Also in 1970 and 1971, Gilbreth was in contact with Innova, Inc., a company which manufactures and sells children's toys, including the "Weeble", an egg-shaped plaything. Gilbreth offered to sell Innova 50,-000 to 5,000,000 heat shrinkable bands to decorate these egg-shaped toys. Gilbreth's own records (*see* Def.Ex. 85) indicate that the heat shrinkable bands worked well when applied to the Innova eggs and that there were no serious problems encountered. Thus, in 1970, Gilbreth again demonstrated that it possessed and sold or attempted to sell the technology for which it sought a patent in 1972. Again, Gilbreth failed to inform the Patent Office of these material facts. This failure to disclose by Gilbreth was bad faith and grossly reckless conduct.

In 1970, Gilbreth was also promoting its heat shrinkable bands in a publication known as the G–030 Bulletin, which Gilbreth distributed in an attempt to foster sales of its heat shrinkable bands. The G–030 Bulletin notes that the bands could be used to bind together a free sample to a large bottle of a product and also emphasizes that the bands can be shrunk upon unusually shaped bottles (*see* Def.Exs. 86, 87). Gilbreth publications also specified that these bands offered for sale by Gilbreth in 1970, possessed the same shrinkage characteristics as the plastic bands for which Gilbreth sought a patent in 1972. Once again, Gilbreth failed to disclose the G–030 Bulletin, Gilbreth's own promotional publication, to the Patent Office. The Patent Office found, as did the CCPA, that the G–030 Bulletin shows that Gilbreth's 1972 patent application should have been rejected on the grounds of obviousness pursuant to 35 U.S.C. § 103.

Clearly the G–030 Bulletin was considered material by the Patent Office. Being unaware of the G–030 Bulletin, the Patent Office granted Gilbreth the patent. When the Patent Office became aware of the G–030 Bulletin, the Patent Office invalidated the patent. The same is true of the Bradford dealings, the Guerlain sales, and the Innova dealings. When unaware of these material facts, the Patent Office granted to Gilbreth its requested patent on the heat shrinkable bands. When aware of these facts, the Patent Office found them to be grounds for invalidating the patent. All four subjects—the Bradford dealings, the Guerlain sales, the Innova transactions, and the circulation of the G–030 Bulletin were considered material by the Patent Office and Gilbreth's failure to disclose the matters was determined by the Patent Office to be fatal to Gilbreth's patent. The evidence presented at the hearing demonstrates that Gilbreth had knowledge of all of these matters and of their materiality but failed to disclose these facts to the

Patent Office. Gilbreth compounded its bad faith by using its wrongfully obtained and now invalidated patent to commence what has turned out to be protracted litigation. Only now, more than 6 years after commencing this meritless litigation, has Gilbreth sought voluntarily dismissal with prejudice pursuant to Fed.R.Civ.P. 41(a). Under the circumstances of this case, the Court will grant Gilbreth's motion on the condition that it pay to the defendants their reasonable attorney's fees and costs in this matter.

*The Applicable Law*

Rule 41(a) provides:

Except as provided in paragraph (1) of this subdivision of this rule, an action *shall not be dismissed at the plaintiff's insistence save upon order of the Court and upon such terms and as the court deems proper.* If a counterclaim has been pleaded by a defendant prior to the service upon his of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

In this litigation, the defendants filed counterclaims near the inception of this litigation in 1976, well before the plaintiffs filed its motion for voluntary dismissal in late 1982. Nevertheless, the defendants do not oppose this Court granting plaintiff's motion for voluntary dismissal on the condition that defendants receive reasonable costs and attorneys' fees from the plaintiff pursuant to 35 U.S.C. § 285.

 In considering a motion for voluntary dismissal, courts have generally allowed dismissal, even dismissal without prejudice, unless the defendant will suffer some plain legal prejudice other than the mere prospect of a second lawsuit. *See Westinghouse Electric Corp. v. United Elec., Radio and Mach. Workers of America,* 194 F.2d 770, 771 (3d Cir.1952), *cert. denied,* 343 U.S. 966, 72 S.Ct. 1060, 96 L.Ed. 1362 (1952); C. Wright, A. Miller and

F. Elliot, 9 *Federal Practice and Procedure,* sec. 2364, at 165. However, the purpose of Rule 41(a)(2) "is primarily to prevent voluntary dismissals which unfairly affect the other side and to permit the imposition of curative conditions." *Alamance Industries, Inc. v. Filene's,* 291 F.2d 142, 146 (1st Cir.), *cert. denied,* 368 U.S. 831, 82 S.Ct. 53, 7 L.Ed.2d 33 (1961). Thus, whether to grant dismissal pursuant to Fed.R.Civ.P. 41(a)(2) lies within the sound discretion of the Court. *See Ockert v. Union Barge Line Corp.,* 190 F.2d 303 (3d Cir.1951). However, where the plaintiff has consented to dismissal with prejudice and the defendants will not face a second lawsuit on plaintiff's claim, the Court should grant the motion for dismissal so long as it is not unfair to the defendant to do so. *See Smoot v. Fox,* 340 F.2d 301, 303 (6th Cir.1964), *cert. denied,* 384 U.S. 909, 86 S.Ct. 1342, 16 L.Ed.2d 361 (1966); *Slotkin v. Brookdale Hospital Center,* 377 F.Supp. 275 (S.D.N.Y.1974); 5 *Moore's Federal Practice* p. 41.05(1) at 41–74. Thus, the presence of defendant's counterclaims, which seek a declaration of the invalidity of the Gilbreth patent, is not a bar to granting the motion for dismissal because the Gilbreth patent has already been declared invalid, because the dismissal sought by plaintiff is with prejudice and defendants will not face a future infringement action based on the now invalid Gilbreth patent and because the counterclaims are merely redundant of issues set forth in the complaint. Furthermore, as heretofore noted, the defendants do not wish to litigate their counterclaims but seek only their reasonable costs and attorneys' fees as a condition of dismissal.

Where the dismissal sought is with prejudice, it has been stated that an award of attorney's fees is inappropriate unless the case is of a kind in which an attorney's fee might otherwise be ordered after termination of the case on the merits or there are exceptional circumstances. *See Pacific Vegetable Oil Corp. v. S.S. Shalom,* 257 F.Supp. 944 (S.D.N.Y.1966); *Lawrence v. Fuld,* 32 F.R.D. 329 (D.Md.1963); *Sarkes*

*Tarzian, Inc. v. Philco Corp.*, 351 F.2d 557 (7th Cir.1965). As heretofore pointed out, this Court has determined that exceptional circumstances are present in the instant case. Furthermore, in the instant case, attorneys' fees would be available to the defendant if the defendant obtained judgment in its favor after trial. As heretofore noted, 35 U.S.C. § 285 permits the Court to award fees to the prevailing party in "exceptional" patent cases. Because this Court has found this litigation to be such an exceptional case, one upon which the defendants would surely prevail after trial on the merits, the Court may condition even a voluntary dismissal with prejudice upon plaintiff's payment to defendant of its attorneys' fees and costs.

■ As heretofore noted, the facts of this case show that 35 U.S.C. § 285 is applicable. Attorney's fees may be awarded under § 285 if the patentee obtained the patent through fraud on the Patent Office, or demonstrated bad faith in bringing and maintaining an action while knowing of the invalidity of the patents. Numerous courts have held that a decree of invalidity based on a finding of fraud upon the Patent Office makes a case "exceptional" within the meaning of 35 U.S.C. § 285. *See W.L. Gore & Associates v. Oak Materials Group*, 424 F.Supp. 700, 704 (D.Del.1976), *aff'd*, 529 F.2d 614 (3d Cir.1976); *Paeco, Inc. v. Applied Moldings, Inc.*, 70 F.R.D. 490 (1976), *aff'd in part, rev'd in part on other grounds*, 562 F.2d 870 (3d Cir.1977). *See also CPA International, Inc. v. Standard Brands, Inc.*, 385 F.Supp. 1057 (D.Del.1974); *Farmer Bros. Co. v. Coca-Cola Co.*, 384 F.Supp. 595 (C.A.C.D.1974); *Chromalloy American Corp. v. Alloy Surfaces Co., Inc.*, 353 F.Supp. 429 (D.Del. 1973). In the instant case, the patent at issue has been invalidated by the Patent Office on the basis of being described in print prior to the patent application (35 U.S.C. § 102(a)), being on sale more than a year prior to the patent application (35 U.S.C. § 102(b)), and being obvious to one skilled in existing plastics technology (35 U.S.C. § 103). Neither the Patent Office, the Board of Patent Appeals, nor the CCPA reached the issue of fraud, because that issue was not before them in the reissue proceedings. Based on the clear and convincing evidence presented at the hearing, this Court has determined that Gilbreth did perpetrate a fraud on the Patent Office. In making this finding, the Court emphasizes that a fraud on the Patent Office differs somewhat from the elements of fraud required under the common law standard. As the CCPA has noted:

> [t]he concept of "fraud" on the Patent Office (at least where a patentee's conduct pertaining to the relative merits of his invention is concerned), encompasses not only that which we have earlier termed "technical" [i.e., common law] fraud, but also a wider range of "inequitable" conduct found to justify holding a patent unenforceable... The courts have become more critical in their interpretation of the relationship existing between applicants for patent and the Patent Office and their scrutiny of the conduct of applicants in light of that relationship. Not unlike those appearing before other administrative agencies, applicants before the Patent Office are being held to a relationship of confidence and trust to that agency. The indicated expansion of the concept of "fraud" manifests an attempt by the court to make this relationship meaningful.

*Norton v. Curtiss*, 433 F.2d 779, 57 CCPA 1384 (1970).

■ This Court recognizes that simple negligence in failing to disclose material facts (e.g., prior art products on sale) to the Patent Office will not amount to a fraud on the Patent Office, even in light of the applicant's fiduciary duty of care owed to the Patent Office from whom the applicant seeks monopoly so that he may profit. However, the facts of this case show much more than simple negligence.

As heretofore detailed, Gilbreth has, for more than a decade, engaged in numerous and repeated withholding of material facts from the Patent Office, disclosing those facts only under the pressure of the de-

fendant's searching discovery, which has on occasion been aided by Court order. As this Court has heretofore found, this prolonged and egregious withholding of material information so clearly known and available to Gilbreth was the result of gross recklessness or bad faith. This conduct also amounts to a fraud upon the Patent Office. Even if Gilbreth had initially been merely negligent, it had an obligation because of its fiduciary relation to the Patent Office to make a disclosure to the Patent Office on any one of the numerous occasions after the filing of the patent application, when Gilbreth's earlier omissions were called to its attention. Gilbreth not only refused to acknowledge its failure to provide such material to the Patent Office and commenced litigation before this Court and the reissue proceedings before the Patent Office. Three levels of Patent Office review squarely rejected Gilbreth's contentions. This Court likewise rejects Gilbreth's contentions. This litigation would never have been conceived if Gilbreth had complied with its duty to make the required disclosures to the Patent Office. Gilbreth's conduct was a fraud on the Patent Office such as to bring it squarely within the exceptional case provision of 35 U.S.C. § 285.

Although, as heretofore set forth, this court has found that the plaintiff's conduct was a fraud upon the Patent Office, it has also been held by many courts that bad faith conduct or recklessness will justify an award of attorney's fees under 35 U.S.C. § 285. *See Paeco, Inc. v. Applied Moldings, Inc.*, 70 F.R.D. 490 (E.D. Pa.1976), *aff'd in part rev'd in part on other grounds*, 562 F.2d 870 (3d Cir.1977); *Watts v. University of Delaware*, 471 F.Supp. 1272 (D.Del.1979), *rev'd on other grounds*, 622 F.2d 47 (3d Cir.1980). *See also Norton Co. v. Carborundum Co.*, 530 F.2d 435 (1st Cir.1976); *Colortronic Reinhard & Co. v. Plastic Controls Inc.*, 668 F.2d 1 (1st Cir.1981); *Kahn v. Dynamics Corp. of America*, 508 F.2d 939 (2d Cir. 1974); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288 (9th Cir.1969). *See also Burndy*

*Corp. v. Kearney-National, Inc.*, 466 F.Supp. 80 (S.D.N.Y.1979); *Trans-World Display Corp. v. Mechtronics Corp.*, 437 F.Supp. 692 (D.S.) (S.D.N.Y.1977); *W.L. Gore & Associates Inc. v. Oak Materials Group, Inc.*, 424 F.Supp. 700 (D.Del.1976). *See also Timely Products Corp. v. Arron*, 523 F.2d 288 (2d Cir.1975); *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198 (7th Cir.1970). As Judge Wright observed in *Gore, supra:*

> [A] patentee who knows or reasonably should know that the patent is invalid on any other ground, but nevertheless sues an alleged infringer is guilty of bad faith. *Shelco, Inc. v. Dow Chemical Co.*, 466 F.2d 613 (7th Cir.1972). If no fraud is involved, the key to the determination of bad faith is the reasonableness of the patentee's belief in the patent's validity.

(424 F.Supp. at 704). The evidence of bad faith or willful misconduct, or recklessness must be clear and convincing as the Court has found in this case (*see American Can Co. v. Crown Cork & Seal Co., Inc.*, 693 F.2d 653, 657 (7th Cir.1982). Where, as in this case, evidence of bad faith and recklessness is clear and convincing, a patent case is exceptional within the meaning of Section 285 even though the evidence may fall short of establishing common law fraud. *See Id.* at 657; *Super Products Corp. v. D.P. Way Corp.*, 546 F.2d 748 (7th Cir.1976).

Therefore, the defendants are entitled to receive their reasonable costs and attorney's fees in this action, including the reasonable costs and attorney's fees which they incurred while contesting the issue of the patent's validity in the reissue proceedings commenced by Gilbreth. As the Ninth Circuit has stated:

> [C]onduct short of fraud and in excess of simple negligence is also an adequate foundation for deciding that a patent action is exceptional. Such conduct is a serious breach of the patentee's duty to the Patent Office. The party who succeeds in invalidating the unlawful patent performs a valuable public service. It is appropriate under such circumstances to reward the prevailing party by giving

him attorney's fees for his efforts, and it is equally appropriate to penalize in the same measure the patentee who obtained the patent by his wrongdoing.

*Monolith Portland Midwest Co. v. Kaiser Aluminum,* 407 F.2d 288, 294 (9th Cir. 1969); *see also Paeco, supra,* 70 F.R.D. at 494. However, in *Mueller Brass Co. v. Reading Industries, Inc.,* 352 F.Supp. 1357 (E.D.Pa.1972), the Court stated that an award of attorney's fees under Section 285 should compensate the parties that have suffered because of another's misconduct but should not punish the losing party. Aware of the purposes underlying Section 285, the Court has determined that the defendants are entitled to fees and costs for both this litigation and the reissue proceedings before the Patent Office.

The Court will order the defendants to submit their application for reasonable attorneys' fees and costs on or before September 15, 1983. The application must be supported by all time records of counsel and detailed statements of services as required by *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., et al.,* 487 F.2d 161 (3d Cir.1973) and its progeny. Any objections to the defendants' fee petition shall be filed by the plaintiff on or before October 10, 1983. An appropriate Order will be accordingly entered.