**REACTIVE METALS AND ALLOYS CORPORATION, Appellant,**

v.

**ESM, INCORPORATED, Appellee.**

**Appeal No. 84–1122.**

United States Court of Appeals,
Federal Circuit.

Aug. 9, 1985.

Lynn J. Alstadt (argued), Buell, Blenko, Ziesenheim & Beck, Pittsburgh, for appellant. With him on brief was Eugene F. Buell.

E.J. Welsh (argued), Parmelee, Miller, Welsh & Kratz, P.C., Pittsburgh, for appellee. With him on brief was William G. Kratz, Jr.

Before SMITH, Circuit Judge, NICHOLS, Senior Circuit Judge, and NIES, Circuit Judge.

NIES, Circuit Judge.

Reactive Metals and Alloys Corp., plaintiff in a patent infringement suit, appeals from a judgment of the United States District Court for the Western District of Pennsylvania, awarding attorney fees to the defendant, ESM, Inc., under 35 U.S.C. § 285 and costs under Fed.R.Civ.P. 54(d). We affirm the award of costs and reverse the award of attorney's fees.

## I.

### Background

On December 18, 1980, appellant Reactive commenced a suit against ESM for infringement of its U.S. Patent No. 4,142,-887 ('887). The date of filing of the application for the '887 patent, February 21, 1978, is significant to this decision. The inventor named in the patent is Leon Luyckx who was Vice President of Marketing and Sales for Reactive until November 1, 1979. ESM counterclaimed for determinations of invalidity and non-infringement. At the time of the filing of the suit at the end of 1980, Luyckx had been working for ESM as a consultant for approximately a year and has remained in its employ throughout the litigation.

The invention of '887 relates to compositions and methods for desulfurizing molten steel. At the time Luyckx developed the patented product, Reactive was selling a line of desulfurizing products under the trademark DEOXSULF. Various products in the line were distinguished by a number. The new products, that is, the products within the claims of the '887 patent, were designated DEOXSULF 3, 3A, 15, 30 and 35. Other mixtures sold under the DEOX-

SULF mark did not fall within the claims of the patent.

Upon preparation of the application, Luyckx signed what was then the standard inventor's declaration which stated that the invention had not been in public use or on sale in the United States more than one year prior to its filing date.[1] The central issue in the case, which developed during discovery, was whether the products had been "on sale" within the meaning of 35 U.S.C. § 102(b) before February 21, 1977. If so, the Luyckx filing was too late under the statute to secure a patent.[2] Reactive's President Joseph R. Jackman, in answering ESM's interrogatories on July 29, 1981, averred, in substance, that no products within the scope of the patent had been "offered for sale" before the critical date and that there was no record of use of DEOXSULF 3. He did state, however, that DEOXSULF 3A had been used on a trial basis as early as March 8, 1976. The specific answers will be discussed in more detail below. In response to a request for production of documents, on August 12, 1981, Reactive gave ESM a summary of sales, entitled "Deoxsulf Shipments," made to customers beginning as early as March 8, 1976 through February 1978, which showed 16 shipments of DEOXSULF 3, 3A, 30 and 35 totalling 100,000+ lbs. to third parties prior to the critical date but which were designated on the summary as for "trial" use.[3] Reactive asserts "trial" meant that the shipments were for experimental or testing purposes. Jackman's deposition was taken on August 25, 1981, by ESM, apparently without inquiry into Jackman's answers as compared to the sales summary.

After the close of discovery and the submission of pre-trial statements by the parties, trial was set to begin on November 15, 1982. On November 12, 1982, at ESM's request, the court held a conference with the parties to consider newly discovered evidence which counsel for ESM had obtained the week before from Luyckx. The evidence consisted of two 1976 advertisements for DEOXSULF 3 in a trade journal. The court postponed the trial and reopened discovery to permit Reactive to depose Luyckx. At the deposition on November 17, 1982, Luyckx produced a folder of documents which he had taken with him when he left the employ of Reactive and in which he had found the advertisements. Following the Luyckx deposition, which substantiated that the advertisements had appeared prior to the critical date, Reactive undertook to terminate the litigation, working out a settlement with ESM which resolved all issues except ESM's claim for costs and attorney fees. The parties presented to the court the following findings of fact and order of dismissal which were accepted and entered by the court on December 20, 1982:

## FINDINGS OF FACT AND ORDER OF DISMISSAL

1. An offer for sale of Deoxsulf 3 appears in the September 1976 and November 1976 issues of "I & SM" magazine.

2. Deoxsulf 3 is at least within the scope of the Claims 1, 2 and 6 of United States Patent No. 4,142,887.

3. The November 1976 advertisement describes the method of Claim 8 of United States Patent No. 4,142,887.

---

1. 37 C.F.R. § 1.65, then applicable, required a statement that there was no statutory time bar. This section of the Regulations was removed effective Feb. 27, 1983, 48 Fed.Reg. 2711 (Jan. 20, 1983). The current rule respecting the content of the oath or declaration, 37 C.F.R. § 1.63 (1983), deletes that requirement.

2. 35 U.S.C. § 102(b) provides:
   A person shall be entitled to a patent unless—
   (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

3. The dissent notes that one deleted item on the summary was "cost" which would indicate something other than "sales price." ESM did not make this argument. We fail to see its significance.

4. United States Patent No. 4,142,887 issued on March 6, 1979 to Leon Luyckx from application, Serial No. 879,610 filed February 21, 1978.

IT IS HEREBY ORDERED THAT:

1. The above-captioned action, including all claims and counterclaims asserted are hereby dismissed with prejudice subject only to the additional terms of this ORDER.

2. Claims 1 thru 8 of United States Patent 4,142,887 are invalid under 35 U.S.C. §§ 102 and 103.

3. Either party may file a petition for reasonable costs and attorney fees within ten (10) days.

In accordance with the above Order, ESM filed a petition for costs and attorney fees asserting that (1) Reactive made "false and misleading answers during discovery concerning whether or not the patented subject matter was 'on sale' "; and (2) Reactive "knew or should have known of the 'on sale' bar." In connection with this request, ESM's counsel sought to obtain Reactive's sales records relating to the shipments of Deoxsulf 3, 3A, 30 and 35 prior to February 21, 1977. After considering objections by Reactive, the court issued a Memorandum Opinion and Order on August 15, 1983, stating that the evidence then of record, including Luyckx's documented testimony, did not support a *prima facie* case of fraud on the Patent Office during prosecution. However, the court believed it appropriate in view of the established invalidity of the patent, to allow discovery to determine whether the patentee could not reasonably have believed in the validity of the patent so as to justify the prosecution of the case. The court opined that proof of sales might establish the "exceptional circumstances" required by § 285 for an award of attorney fees. Thus, ESM was given the opportunity to explore Reactive's sales activities during the period in question.

Through additional discovery seeking "all documents used in preparing the attached chart entitled 'Deoxsulf Shipments,' previously provided by plaintiff on August 12, 1981," ESM obtained the invoices evidencing the sales to third party steel companies together with memoranda discussing testing of the product at various steel mills. Defendant then filed a Supplemental Memorandum in support of its petition for costs and attorney's fees submitting therewith documents which ESM obtained during the most recent discovery period, the most significant of which to the court were the invoices.

On March 22, 1984, the district court issued an Opinion and Order granting ESM an award of attorney fees and costs, stating therein: "As noted above, this court previously held that (as of December 20, 1982) the evidence did not establish that this case was exceptional so as to permit the award of attorneys' fees." However, the court held that the invoices showed that the subject transactions were "of the 'extent, character and duration' which would have barred the issuance of Patent '887 had this been revealed to the Patent Office." Thus, the activities, per the court, constituted barring "sales" not experimental "trials." The court further held that Reactive failed to respond truthfully in stating, in answer to ESM's interrogatory, that there was no record of any use of DEOXSULF 3 since there were sales records for that product. That answer also estopped Reactive from claiming that the sales were for experimental use only. Finally, the court found support for its position on the invoices from the advertisements which did not indicate the "trial" status of DEOXSULF 3.

In view of the above, the district court concluded:

This Court finds that Reactive's failure to respond truthfully to Interrogatory No. 1.01(1)(i) propounded by ESM was an act of bad faith and considers this to be the type of misconduct contemplated by 35 U.S.C. § 285 and the *Palmer* Court. The sales records later produced unquestionably contradicted the sworn statement made by Reactive's president. This conduct makes this an "exceptional" case

and warrants the award of reasonable attorneys fees.[5]

5. This Court also notes that bad faith on the part of Reactive is established by the two-prong test enunciated in *W.L. Gore and Associates v. Oak Materials Group*, 424 F.Supp. 700 (D.Del.1976). This test is that first, the defendant established that the patent is invalid and second, that the patentee could not reasonably believed [sic] in the validity of the patent so as to justify the prosecution of this case. As noted in this Court's Opinion dated August 15, 1983, the first prong had been met at that time. With respect to the second prong of the *Gore* test, it has also been met in light of the volume of sales which transpired prior to the patent application in direct derogation of 35 U.S.C. § 102(b).

On appeal, Reactive argues that it was error for the court to reopen discovery following settlement and that the court violated Reactive's constitutional right to a trial by jury. Further, it argues that the record, even supplemented with the invoices, does not support the award of attorney fees under 35 U.S.C. § 285. It challenges the award of costs as inequitable asserting that it was ESM's own lack of diligence in failing to consult with Luyckx at an early date that prolonged the litigation.

ESM counters these arguments, and asserts, in essence, that the invoices produced during the last discovery provide the necessary support in the record for a finding of "bad faith."

## II.

### Issue

The issues in this appeal are the propriety of the awards of attorney fees and costs to ESM.

Our jurisdiction over the appeal is found in 28 U.S.C. § 1295(a)(1), the jurisdiction of the district court being based on a patent claim under 28 U.S.C. § 1338(a).

## III.

### Standard of Review of Award of Attorney Fees Under 35 U.S.C. § 285

The patent statute in 35 U.S.C. § 285 provides for an award of attorney fees in the following terms:

The court in exceptional cases may award reasonable attorney fees to the prevailing party.

■■■ The proposition is frequently stated that "an award of attorney fees is within the discretion of the trial judge," *Orthopedic Equipment Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1384, 217 USPQ 1281, 1287 (Fed.Cir.1983). The proposition does not mean, however, that, on appeal, the only standard of review to be applied is "abuse of discretion." As the statutory language indicates, the necessary predicate for the exercise of discretion by the trial court is a finding that the case is "exceptional" because of, *inter alia,* inequitable conduct during prosecution of the patent or misconduct during litigation. *Bayer Aktiengesellschaft v. Duphar International Research B.V.*, 738 F.2d 1237, 1242, 222 USPQ 649, 652 (Fed.Cir.1984). A finding of such "exceptional" circumstances does not, however, mandate an award of attorney fees. It is at this point that the trial court exercises its discretion in making, or not making, an award. For example, even though inequitable conduct before the PTO is found, fees may be refused to the prevailing party. *Rohm & Haas Co. v. Crystal Chemical Co.*, 736 F.2d 688, 229 USPQ 97 (Fed.Cir.1984).

■■■ At the trial level, a prevailing party who seeks an award of attorney fees has the burden of proof of facts which establish the exceptional character of the case. The quantum of proof required to prove bad faith conduct is clear and convincing evidence. *See, e.g., Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1538, 222 USPQ 553, 560 (Fed.Cir.1984). In order to provide a basis for meaningful review, it is incumbent on the trial court not only to make the ultimate finding that the case is exceptional, but also to articulate the more particular factual findings from which the finding of "exceptional circumstances" follows. *Hughes v. Novi American, Inc.*, 724 F.2d 122, 124, 220 USPQ 707 (Fed.Cir.1984); *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 712–13, 218 USPQ 969, 975 (Fed. Cir.1983); *Stickle v. Heublein, Inc.*, 716

F.2d 1550, 1564–1565, 219 USPQ 377, 388 (Fed.Cir.1983).

On appeal, this court must review the factual underpinnings of the award under the clearly erroneous standard of Fed. R.Civ.P. 52(a). *Orthopedic Equipment,* 707 F.2d at 1384, 217 USPQ at 1287. Further, where the basis for the award is inequitable conduct before the PTO, this court must also be satisfied that the correct *legal* standard was applied by the district court in reaching its conclusion. *Hycor Corp. v. Schlueter Co.,* 740 F.2d at 1538–39, 222 USPQ at 560. *Accord, Bayer Aktiengesellschaft,* 738 F.2d at 1242, 222 USPQ at 653 (award based on magistrate's misconception of legal doctrine of file history estoppel vacated). Only if these factual and legal underpinnings withstand scrutiny do we reach the question of whether the district court abused its discretion in making an award. Thus, the issue of discretion comes into play, not in determining whether the case is exceptional, but in deciding, with respect to an exceptional case, whether the award of attorney fees was appropriate and whether the amount of the award was reasonable. *Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1068, 219 USPQ 670, 678 (Fed.Cir.1983).

## IV.
### The Merits

Since a § 102(b) bar *based on the 1976 advertisements* offering DEOXSULF 3 was acknowledged by Reactive, the question left open with respect to misconduct during trial was not whether there were actual sales which also established a § 102(b) time bar, but whether plaintiff acted with wrongful intent in bringing the suit or in answering the propounded interrogatories. However, despite the reopening of discovery, no evidence was developed directly relating to the issue of Reactive's wrongful intent, nor do the invoices on which the district court relied provide a basis from which wrongful intent can be reasonably inferred.

The district court stated that while patent invalidity alone would not justify fees under 35 U.S.C. § 285, "material mis-representation to the Patent Office (failure to disclose pre-application sales) and the prosecution of the lawsuit in bad faith constitute 'exceptional' circumstances so as to warrant the award of attorneys' fees." Underlying the trial court's decision appears to be an assumption that it is incumbent upon an applicant or his attorney to disclose to the PTO all use activities which occurred prior to the application date so that the PTO examiner can decide whether such activities amount to a public use or on-sale time bar under § 102(b). No precedent of this court or of any other circuit supports this broad proposition. Such activities may or may not be "material" to examination. Where commercial sales of an identical or similar product are known by the applicant to have occurred more than one year prior to filing, such product is prior art and falls within the duty of disclosure. *Argus Chemical v. Fibre Glass-Evercoat,* 759 F.2d 10, 225 USPQ 1100 (Fed.Cir.1985). On the other hand, there is no point in bringing sales activities to the examiner's attention which, for example, did not occur before the one-year grace period simply to have the examiner "decide" that the sales were not early enough to trigger the time bar. Similarly, in the face of an affidavit that certain "sales" were for experimental purposes, the "sales" information would have no effect on examination. An examiner is not in a position to effectively challenge such an assertion.

Attorneys have to make judgments on many matters before filing a patent application. To avoid a charge of inequitable conduct, they do not have to raise and explain to the PTO all problems they have considered. Rather, assuming the non-disclosed invoices do create a time bar, the fact of *nondisclosure* (as opposed to the bar itself) would have no effect on the litigation unless there were also proof of actual wrongful intent or gross negligence in the nondisclosure. Simple negligence is not enough. *Hycor Corp,* 740 F.2d at 1540, 222 USPQ at 562. On the other hand, as to any matters not disclosed, they do run a risk beyond proving their own

good faith. As this court stated in *J.P. Stevens & Co. v. Lex Tex., Ltd.*, 747 F.2d 1553, 1560, 223 USPQ 1089, 1092 (Fed.Cir. 1984):

Proof of deliberate scheming is not needed; gross negligence is sufficient. Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of a withheld reference. On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient. [Citations omitted.]

In the case at hand, there is no evidence of actual wrongful intent or gross negligence by the patentee or Reactive. Indeed, the only evidence of negligence during prosecution is the testimony of the inventor Luyckx who was aware of the advertisements and sales prior to the critical date and who signed the oath for the application with a misunderstanding and disregard of its significance. However, the district court had considered that evidence in its August 15, 1983 order and specifically found it insufficient to establish wrongful intent (i.e., fraud or gross negligence). We cannot see any basis in the record for attributing greater misconduct before the PTO to Reactive than to the inventor.

In any event, the specific ground stated for finding this case to be "exceptional" under 35 U.S.C. § 285 is Reactive's failure to respond truthfully to an interrogatory. In particular, on July 29, 1981, Joseph R. Jackman, President of Reactive, replied as follows to ESM's interrogatory No. 1.0.(1)(i) requesting the dates on which certain mixes were "offered for sale":

Mixes I, II, III were each offered for sale on or about the date of their first sale. Deoxsulf 3 and 3A were never offered for sale.

The district court held that the *invoices* contradicted Jackman's sworn statement and the above "false" answer constituted the type of conduct which made the case "exceptional." We cannot agree.

The above question and answer "(i)" is at best ambiguous in the context of the suit. It was, at that time, Reactive's position that there were no "offers for sale" in the § 102(b) sense during the critical time. Thus, the answer can be taken as no more than a good faith reply to a technical question which sought to obtain an admission of a time bar. This interpretation appears reasonable in light of the following answer with respect to DEOXSULF 3A in Part (iv) of the same interrogatory:

The mixes were first used on a trial basis on these dates.

| | |
|---|---|
| Mix I | between March 11 and June 9, 1977 |
| Mix II | between March 11 and April 5, 1977 |
| Mix III | between August 24 and September 16, 1977 |
| Deoxsulf 3 | no record of any trial use |
| Deoxsulf 3A | March 8, 1976 |

Mixes I, II and III were the only mixes used on a commercial basis. Those uses occurred after their date of the first sale listed above.

The above answer with respect to DEOXSULF 3 was clearly wrong in view of the invoice records. However, that answer loses its importance, inasmuch as, in the regular course of discovery, that answer was corrected approximately two weeks later. On August 12, 1981, Reactive's counsel, in accordance with discussions with ESM's counsel concerning ESM's request for production of documents, sent a complete listing of "Deoxsulf shipment records on which we have substituted letters for customer names and blanked out cost information." Thus, ESM had in its possession the following information, well in advance of the reopened discovery:

### Deoxsulf Shipments

| Date | Company and Destination | Product Type | Amount-lbs. | Cost | Use |
|---|---|---|---|---|---|
| 3/08/76 | A | 3A | 6,000 | | Trial |
| 3/26/76 | A | 3 | 26,000 | | Trial |
| 3/26/76 | B | 3 | 2,000 | | Trial |
| 5/25/76 | B | 3 | 2,000 | | Trial |
| 9/24/76 | C | 3 | 5,600 | | Trial |
| 10/08/76 | C | 3A | 5,600 | | Trial |
| 10/15/76 | D | 3 | 5,600 | | Trial |
| 10/20/76 | C | 3A | 16,800 | | Trial |
| 10/20/76 | C | 3 | 2,800 | | Trial |
| 10/28/76 | E | 30 | 1,100 | · | Trial |
| 11/09/76 | E | 30 | 1,100 | | Trial |
| 11/10/76 | C | 35 | 2,800 | | Trial |
| 11/18/76 | F | 30 | 10,800 | | Trial |
| 1/14/77 | C | 35 | 5,600 | | Trial |
| 1/24/77 | D | 35 | 12,000 | | Trial |
| 1/28/77 | G | 30 | 1,600 | | Trial |

[The listing continues through Feb. 1978] The attorney further explained that Deoxsulf 3 and 3A were the predecessors of Deoxsulf 30 and 35, respectively, and that the numbers 3 and 3A had been used for the *same* product.

▮ ESM does not dispute that ESM's attorney agreed to the above chart in lieu of the actual invoices after Reactive objected to producing the originals because they contained customer names and costs. The invoices ultimately produced do no more than confirm the accuracy of the chart previously submitted. As the record shows, the chart was a detailed listing, transaction by transaction, of the individual invoices with full information except for names which, however, were known to ESM to be of "customers" who paid for the shipments. Accordingly, the invoices produced two years later were not the first disclosure of transactions, i.e., "sales," involving DEOXSULF 3 nor, in any sense, were they "newly discovered" evidence which destroyed the basis for Reactive's case. Despite these "sales," Reactive was prepared to litigate its claim of infringement on the theory that these "sales" during the critical period were for testing or experimental purposes. Contrary to the district court's finding, the invoices themselves do not establish the "character" of the transactions, that is, that the invention was "on sale" within the meaning of § 102(b), so that Reactive's position was known to it to be frivolous or advanced in bad faith.[4] What destroyed Reactive's case was not the eventual production of original invoices, but rather Luyckx's bringing the *advertisements* to light. With respect to the advertisements, ESM argues that Reactive should have known that DEOXSULF 3 had been advertised. However, the district court attributed no bad faith to Reactive as a result of

Luyckx's testimony or those exhibits and, in its final opinion, the court never changed that conclusion.

▮ Considering the record as a whole, the district court's finding that the invoices establish the deliberate (or grossly negligent) falsity of Reactive's interrogatory answer is clearly erroneous. The chart provided a prompt and accurate correction. ESM's assertion of reliance "for a time" on the sworn answers can mean no more than for a period of two weeks—*early* in the case. Its argument that that "type of conduct ... can often mislead a party" has the virtue of honesty since ESM does not contend it was actually misled. The evidence to establish (or infer) bad faith in Jackman's interrogatory answer falls far short of the "clear and convincing" standard. Accordingly, the case cannot be found "exceptional" under § 285 because of unconscionable conduct during discovery. *White Consolidated Industries v. Vega Servo-Control, Inc.*, 713 F.2d 788, 792, 218 USPQ 961, 964 (Fed.Cir.1983).

## V.

### Costs

▮ Reactive also appeals the award of costs to ESM claiming that such an award is without precedent where the parties have agreed to settlement of litigation. However, the dismissal order to which the parties stipulated specifically left open the question of costs. The district court based its cost award on Fed.R.Civ.P. 54(d) which provides that an award of costs "shall be allowed as of course to the prevailing party unless the court otherwise directs." While the litigation was "settled," ESM clearly prevailed on the merits, as the district court found. Thus, we see no basis for a challenge to the award of costs either as

---

**4.** The record contains numerous memoranda in support of Reactive's position, including indications that the large amounts shipped were appropriate for testing batches of steel. We express no opinion on the merits of whether any of the "uses" or "sales" constituted § 102(b) time bars, but simply note this evidence as negating "frivolousness." However, it must be also noted

that advertisements would not necessarily convert experimental use into barring use. Whether there was a use which would bar issuance of the claims under § 102(b) "must be determined by considering the totality of circumstances." *Hycor Corp. v. Schlueter Co.*, 740 F.2d at 1535, 222 USPQ at 557.

contrary to the "settlement" or to the above rule.

## VI.

### Conclusion

The decision of the district court awarding attorney fees to ESM is *reversed*. The award of costs is *affirmed*.

Each party shall bear its own costs of this appeal.

REVERSED–IN–PART, AFFIRMED–IN–PART.

EDWARD S. SMITH, Circuit Judge, dissenting.

I respectfully dissent. I do not agree with the majority's conclusion that the trial judge's finding of exceptional circumstances to award attorney fees is clearly erroneous. Because I believe the award of attorney fees to ESM should be affirmed, I have also considered whether the trial judge abused her discretion by reopening discovery, and conclude that there was no abuse of discretion.

### I.

### Exceptional Circumstances

The majority states that a district judge must make a finding of exceptional circumstances upon which to exercise her discretion to award attorney fees, and that such an award must be reversed if the finding of exceptional circumstances is clearly erroneous. Furthermore, the majority requires that a party's actions that establish exceptional circumstances must be supported by proof of wrongful intent or gross negligence by that party.[1] I agree completely with this statement of the law. I disagree that the trial judge made any clear error in finding exceptional circumstances in this case.

I believe that the facts of this case do not show any clear error in the trial court's finding that Reactive answered at least one interrogatory falsely and with wrongful in-

tent. I accept the majority's statement of facts as accurate and complete with one exception: the majority does not mention one of Reactive's internal memoranda that shows that Deoxsulf 3 and 3A were sold at market prices before the critical date. This memorandum shows clearly that some of Reactive's shipments before the critical date were sales of Deoxsulf 3 and 3A. At the very least, the trial judge's finding that Deoxsulf 3 was offered for sale before the critical date cannot be said to be clearly erroneous.

Reactive's president, Joseph R. Jackman, answered interrogatory No. 1.0.(1)(i) that Deoxsulf 3 and 3A were "never offered for sale." The majority interprets this answer to be Reactive's denial of offering Deoxsulf 3 and 3A for sale before the critical date, in light of the answer to interrogatory 1.0.-(1)(iv). The answer to interrogatory 1.0.-(1)(iv) gives dates that trial use of the patented products occurred, but states that there was "no record of trial use" for Deoxsulf 3. The majority believes that Reactive's production of a shipment summary corrected this erroneous statement 2 weeks later, and that the alleged sales were in fact trials, as the summary stated. That shipment summary, however, only shows information that would lead ESM to believe trials had been conducted. In no way does it suggest that Reactive sold Deoxsulf 3 and 3A *for consideration and at market prices* before the critical date, as the invoices show. Furthermore, the shipment summary is very misleading in an extremely subtle manner. The summary shows a "cost" item for each shipment, with "blanked out cost information." In a trial or experimental setting, the cost of raw materials or cost of experimentation is very valuable business data and is entitled to confidentiality during litigation. Reactive's invocation of such a right to maintain trade secrets, however, shielded unprotected information that ESM sought—the truth that Reactive had shipped the patented product for a market-based consideration before the critical date. No one looking at

---

**1.** *Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529, 1540, 222 USPQ 553, 562 (Fed.Cir.1984).

this shipment summary or its cover letter would suppose that the blanked-out *"cost"* data referred to the market *prices* at which the products were sold. I conclude that the shipment summary could not have cured the alleged innocent errors in the interrogatories and given ESM enough information to deduce that Reactive had violated the on-sale bar of 35 U.S.C. § 102(b). At most, the shipment summary raises a conflict with the interrogatories as to whether any trials of Deoxsulf 3 occurred before the critical date. I cannot believe Jackman was so grossly incompetent that he did not know that Deoxsulf 3 and 3A were sold at market prices before the critical date. Even if he were, it would not change the result.[2] I have no doubt that the intent requirement was satisfied. Because I do not believe that the trial judge's finding of exceptional circumstances on the basis of falsely answered interrogatories was clearly erroneous, I would affirm.

The majority states that the applicant's duty to disclose activities material to an on-sale bar to the PTO is not so broad as to include all use activities which occurred prior to the application date. I agree. However, 35 U.S.C. § 102(b) proscribes commercial exploitation of the patented subject matter more than 1 year before the application date such as to effect an extension of the exclusive term fixed by statute.[3] In this case, Reactive sold the patented product at market prices before the critical date. What more would an applicant have to do to exploit the patented product commercially in order to face the duty of candor to disclose such sales to the PTO? How could Reactive reasonably have believed such sales to be trials? I think that the prospective patentee would have a heavy burden to carry in proving that such sales were actually trials. At any rate, the trial judge did not rely on inequitable conduct before the PTO by Reactive to establish exceptional circumstances. The majority's position on this score is quite correct. Nevertheless, Reactive should have disclosed these sales to the PTO. Because I conclude that the trial judge's finding of exceptional circumstances based on the falsely answered interrogatories is not clearly erroneous, I would affirm.

## II.

### *Reopening of Discovery*

In order to affirm, it is necessary to decide whether the trial judge exercised her discretion properly in reopening discovery. I conclude that she did not abuse her discretion.

Reactive dismissed its complaint voluntarily because the 1976 ads acted as an on-sale bar to validity of the '887 patent under 35 U.S.C. § 102(b). Reactive characterizes this dismissal with prejudice as a "settlement." However, this was *not* a voluntary dismissal by stipulation of the parties as provided for in FED.R.CIV.P. 41(a)(1) but rather a dismissal by order of the court pursuant to FED.R.CIV.P. 41(a)(2).[4] Had Reactive and ESM wished to

---

**2.** *Id.*

**3.** 35 U.S.C. § 102(b) (1982).

**4.** FED.R.CIV.P. 41(a)(1) and (2) read as follows:
"Rule 41. Dismissal of Actions
"(a) Voluntary Dismissal: Effect Thereof.
"(1) *By Plaintiff; by Stipulation.* Subject to the provisions of Rule 23(e), of Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.
"(2) *By Order of Court.* Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon him of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless

use the former rule, they could have reached agreement (settlement) and filed a stipulation of dismissal without involving the trial court judge. However, Reactive followed the latter rule and obtained a dismissal by an order of the district court dated December 20, 1982. Such an order may be issued only "upon such terms and conditions as the court deems proper." The language of the rule commits the terms and conditions of this category of voluntary dismissal to the court's discretion. The trial judge reserved consideration of any claim for attorney fees and costs either party might advance as a condition for dismissal, and we cannot say that this was an abuse of discretion. The facts of this case disclose more an abuse of discovery than an abuse of discretion and are very different from those of the *Larchmont* case [5] in which the trial judge refused to hold a hearing. The Second Circuit, however, used analysis equally applicable here. There, the Court of Appeals for the Second Circuit wrote,[6]

> The question is peculiarly one within the discretion of the *Nisi Prius* judge who in this case was more familiar than we are with the claims and with the likelihood of defendants' establishing bad faith. * *

Reactive relies on the legal standard announced by the *Gore* decision.[7] In the event of dismissal before trial, the trial court in *Gore* required the defendant to satisfy a 2-pronged test to establish an exceptional case under 35 U.S.C. § 285 before a hearing could be held to develop evidence of bad faith. The defendant had

to submit a prima facie case that (1) the patent was invalid and (2) the patentee had no reasonable belief that the patent was valid, so that an action for infringement could not be justified. I agree with this standard—in a dismissal before trial by order of the court, discovery may be reopened and new evidence submitted only if the party asking for attorney fees has established a prima facie case that the other party has prosecuted or defended in bad faith.

The trial court here based its decision to reopen discovery on the section 102(b) bar raised by the 1976 advertisements. The section 102(b) bar rendered the patent invalid, and the advertisements, with nothing more, facially suggested Reactive's bad faith. The trial judge clearly reserved the issue of attorney fees in the order dismissing the rest of the action, as the majority shows. I believe that the advertisements and the arguably inconsistent shipment summary and interrogatories provide a basis for the trial judge to infer Reactive's bad faith, which facts would warrant the reopening of discovery. While the issue is a close one, I think the trial judge was justified in allowing ESM to develop the facts showing Reactive's sales. I would affirm.

---

otherwise specified in the order, a dismissal under this paragraph is without prejudice."

**5.** *Larchmont Eng'g, Inc. v. Toggenburg Ski Center, Inc.,* 444 F.2d 490, 170 USPQ 241 (2d Cir. 1971).

**6.** *Id.* at 491, 170 USPQ at 242.

**7.** *W.L. Gore & Assocs. v. Oak Materials Group, Inc.,* 424 F.Supp. 700, 192 USPQ 687 (D.Del. 1976).