5 F.3d 1506
 28 U.S.P.Q.2d 1852
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
C.R. BARD, INC., Plaintiff-Appellant,
v.
ADVANCED CARDIOVASCULAR SYSTEMS, INC., Defendant-Cross-Appellant.
 Nos. 92-1372, 92-1402.
 United States Court of Appeals, Federal Circuit.
 Aug. 31, 1993.
 
 Before RICH, MAYER, and LOURIE, Circuit Judges.
 RICH, Circuit Judge.
 
 DECISION
 
 1
 This patent infringement suit was filed by plaintiff-appellant, C.R. Bard, Inc. (Bard), against defendant-cross-appellant, Advanced Cardiovascular Systems, Inc. (ACS) in the United States District Court for the Northern District of California. Bard appeals from the district court's February 26, 1992 judgment dismissing Bard's action on the ground that U.S. Patent No. 4,545,390 (the '390 patent) is unenforceable by reason of inequitable conduct before the Patent and Trademark Office (PTO). ACS cross-appeals from the judgment that this is not an exceptional case entitling ACS to an award of attorney fees under 35 U.S.C. Sec. 285.[1] We affirm.
 
 DISCUSSION
 A. Inequitable Conduct
 
 2
 The '390 patent is directed to a small diameter steerable guide wire (less than .020" in diameter), for use in percutaneous transluminal coronary angioplasty (PTCA) to treat coronary arterial narrowing. The guide wire is threaded through the distal end of a balloon catheter and into the coronary artery, and is then selectively manipulated and steered by the physician to the stenosis. The progress of the guide wire, which usually has a radiopaque tip, is observed under a fluoroscope. Once the guide wire reaches the stenosis, the balloon catheter is advanced over the guide wire to the stenosis and placed in position for inflation of the balloon. The inflation of the balloon enlarges the stenosed lumen of the artery, permitting increased blood flow upon removal of the catheter.
 
 
 3
 The district court's unenforceability determination rests on several findings of misconduct by Bard during the prosecution of the '390 patent application. The court, after an extended jury trial, determined that, among other things, Bard failed to disclose material prior art known to the applicant and others substantively involved in the prosecution of the '390 application, and misrepresented material information about the prior art to the PTO. In addition, the court determined that the prior art was withheld and misrepresented with the intent to deceive the PTO.
 
 
 4
 A finding of inequitable conduct requires the trial court to balance materiality and intent to determine whether or not inequitable conduct has occurred. J.P. Stevens & Co. v. Lex Tex, Ltd., 747 F.2d 1553, 1559-1560, 223 USPQ 1089, 1092, cert. denied, 474 U.S. 822 (1985). Materiality and intent are each factual findings reviewed under the clearly erroneous standard, and will not be disturbed unless there is a definite and firm conviction that a mistake has been committed. J.P. Stevens, 747 F.2d at 1562, 223 USPQ at 1094. Balancing these facts to determine unenforceability is equitable in nature and will not be disturbed absent an abuse of discretion. Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 876, 9 USPQ2d 1384, 1392 (Fed.Cir.1988), cert. denied, 490 U.S. 1067 (1989). For the reasons that follow, we find that the district court did not abuse its discretion in finding the '390 patent unenforceable.
 
 
 5
 Bard filed its patent application on September 22, 1982. The application contained sixteen claims directed toward a small diameter guide wire which included the limitation of a distal spring extension extending beyond the distal end of the main wire.[2] All claims, except claim 6, included a limitation requiring a small diameter guide wire without a specific size limitation. Claim 6 specified a diameter no greater than approximately .020". Claim 5 claimed a guide wire wherein the diameter of the spring was not substantially greater than the diameter of the main wire.
 
 
 6
 All sixteen claims were rejected in the first office action under 35 U.S.C. Sec. 103 as being unpatentable over Antoshkiw in view of other prior art. Antoshkiw discloses a guide wire which is very similar to the wire claimed in the '390 patent. The guide wire comprises a main wire with a metal core wire which is covered with a Teflon jacket, and a short distal portion of a reduced diameter length of core wire covered with a coil spring. The spring and main wire are substantially equal in diameter. Antoshkiw specifically states that
 
 
 7
 [t]he outer diameters of spring 18 and jacket 16 are substantially equal and vary from 0.021 to 0.047 of an inch. However, other diameters are contemplated and must be considered to be within the teachings of the present invention. [Emphasis ours.]
 
 
 8
 In order to overcome the rejection based on Antoshkiw, Bard's patent attorney requested that Bard's engineer conduct a test that could be used to demonstrate to the examiner that the Antoshkiw guide wire does not work as a steerable guide wire at small diameters (less than .020"). In response, Bard built and tested a "scaled down" model of the Antoshkiw guide wire comprised of a main "wire" which was only .016" in diameter. The "wire" was comprised of a metallic core wire of only .008" diameter covered with a .004" thick Teflon jacket.[3] Bard justified the thick Teflon jacket and relatively thin metallic core wire as being scaled from the patent drawing. The test results were then used to support the argument that the Antoshkiw wire would not work as a steerable guide wire because at small diameters the steering could not be controlled because the wire would whip around in the artery due to stored up rotational energy. No other diameter sizes were constructed or tested.
 
 
 9
 Bard then amended all the claims by limiting the wire diameter to smaller than .020" and adding to every claim preamble the term "steerable." In Bard's response to the examiner, Bard argued that Antoshkiw specifically mentions a range of possible diameters, but is not suitable to smaller diameter wires of the type being claimed because, if scaled down, the weakened torsional strength of the reduced scale device would not provide the rotational capability for a steerable small diameter guide wire.
 
 
 10
 Despite Bard's argument, the examiner again rejected the claims with the size limitation stating that
 
 
 11
 [t]he reference shows the essential structure claimed lacking the diameter being .020". Antoshkiw's lower diameter is disclosed as .021". It is submitted that .001" is only a difference of degree rather than one of kind. Antoshkiw states other diameters are contemplated which certainly does not rule out using one that [sic] .001" less than that disclosed.
 
 
 12
 To overcome the rejection, Bard arranged for a personal interview with the examiner and demonstrated a Bard commercial guide wire. The examiner then agreed to favorably consider claims with the further limitation:
 
 
 13
 "means to prevent torsional whipping (or provide torsional rigidity) in very small diameter wire (less that .020").
 
 
 14
 Bard then filed a second amendment in which he included in every claim the limitation of "means sufficiently torsionally rigid" to transmit to the distal end the angular rotation applied to the proximal end. The prior art structures were distinguished with the factual representation that when they were made in the claimed small size, they failed:
 
 
 15
 In general, a guide wire or catheter having a particular feature or characteristic when made in a larger size might not retain that characteristic when made in a smaller size. That is precisely the case here. The prior art structures, when reduced to a smaller size, failed to transmit torque in the manner of and as effectively as the applicant's invention.
 
 
 16
 The district court found that the construction and testing of the scaled down model of the Antoshkiw guide wire and the statements made based on the test were false and misleading. The court held that Bard should have known that the test conducted was scientifically unsound and that guide wires constructed according to the teachings of Antoshkiw would function well at diameters of .020" and below. The record contains substantial evidence to support the district court's findings. For example, ACS performed several in-court demonstrations using a number of guide wires of different diameters ranging from .022" to .0125" to show that they all transmitted rotation from the proximal end to the distal end without whipping. ACS's expert testified that they were constructed as simply as possible and in the manner that those skilled in the art would have understood from Antoshkiw in 1981-82.[4]
 
 
 17
 The court also found that Bard failed to disclose material prior art that discussed existing over-the-wire (OTW) catheter systems and guide wires having a diameter of less than .020". For example, the court found that Bard knew of the Simpson-Robert OTW catheter system which uses a wire having an .018" diameter. The Simpson-Robert catheter was co-invented by Dr. John Simpson in 1978 and described in U.S. Patent No. 4,323,071, issued in April 1982. Dr. Simpson testified that he attempted to license his system to Bard in 1978, and that Bard declined. He then founded ACS in 1979, the Simpson-Robert catheter system was manufactured, and the product became a commercial success and a perceived threat to Bard.
 
 
 18
 Despite the fact that several persons involved with the prosecution of the '390 patent application knew of the Simpson-Robert catheter, neither the construction of the device nor the patent covering the device was ever disclosed to the PTO. On the contrary, Bard's patent application stated:
 
 
 19
 While suggestions have been made to use a guide wire to advance such a slender catheter as a coronary dilatation catheter, no suitable device was known which could serve properly as a guide wire while being small enough to permit the relatively small diameter dilatation catheter to be slipped over and advanced along the guide wire.
 
 
 20
 Rather than disclose the existence of the Simpson-Robert catheter, the application suggested that such a guide wire system was not possible prior to the '390 invention.
 
 
 21
 In addition, Bard suggested in its application that the size (diameter) of the '390 guide wire was a departure from the prior art.[5] However, despite this statement, and Bard's subsequent attempts to overcome the examiner's rejection based on the small wire diameter disclosed in Antoshkiw, Bard failed to disclose prior art teaching, among other things, a small diameter. For example, the court found that several persons involved in the prosecution of the '390 application knew of the Robert-Simpson OTW system which used an .018" guide wire and that guide wires of less than .018" were routinely available.[6]
 
 
 22
 The court found that the information withheld and misrepresented by Bard was material because a reasonable examiner would have considered it to be important in deciding whether or not to allow the claims of the '390 application to issue. See 37 C.F.R. Sec. 1.56(a); A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1397, 230 USPQ 849, 853 (Fed.Cir.1986).
 
 
 23
 Bard has failed to convince us that the district court's finding is clearly erroneous. Every applicant for a patent has an uncompromising duty to deal candidly with the PTO during the patent application process. Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 818, reh'g denied 325 U.S. 893 (1945). Here, the evidence suggests that, prior to filing its application, Bard was in possession of material information which was concealed or misrepresented in the application's specification, misrepresented by way of sloppy testing, and generally strategically withheld from the examiner. In view of the evidence, we cannot say that the district court's finding that Bard failed to uphold its duty is clearly erroneous.
 
 
 24
 In addition, the court, relying on the totality of the circumstances, found that Bard withheld and misrepresented the state of the prior art with an intent to deceive the PTO. Intent need not, and rarely can, be proven by direct evidence. It is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor. Kansas Jack, Inc. v. Kuhn, 719 F.2d 1144, 1151, 219 USPQ 857, 861 (Fed.Cir.1983). Such intent usually can be found as a matter of inference from circumstantial evidence. Merck & Co. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1422, 10 USPQ2d 1682, 1686 (Fed.Cir.1989).
 
 
 25
 ACS has provided an outline of events illustrating the competitive pressure ACS and Dr. Simpson were placing on Bard. The evidence reveals that from 1981 to 1984 Bard perceived ACS and Dr. Simpson as an ever-increasing business threat. In April 1981, Bard had identified Dr. Simpson a "major watch-out"; by February 1982, ACS and Dr. Simpson justified Bard's development of its OTW system; and, by July 1983, ACS was driving Bard's sales force into a "panic." Thus, these contemporaneous marketing pressures were already present and known to Bard during the prosecution of the '390 application and, specifically, in 1984 when it conducted the Antoshkiw tests, and in 1985 during the interview with the examiner. When these circumstances are considered along side Bard's conduct during the prosecution of the '390 patent application, it appears entirely reasonable for the district court to have found that the latter was motivated by the former. Thus, under the circumstances of this case, we cannot say that the district court's finding that Bard's misconduct was made with an intent to deceive is clearly erroneous.
 
 
 26
 We have reviewed all of Bard's arguments on appeal. Regardless, we are left unconvinced that the district court abused its discretion in finding the '390 patent unenforceable.
 
 B. "Exceptional" Case
 
 27
 ACS argues on cross-appeal that, in view of Bard's inequitable conduct, the district court erred in failing to find this an exceptional case warranting an award of attorney fees under 35 U.S.C. Sec. 285. We review the court's underlying factual findings on this issue under the clearly erroneous standard and its legal conclusion de novo. Reactive Metals Alloys Corp. v. ESM, Inc., 769 F.2d 1578, 1583, 226 USPQ 821, 824 (Fed.Cir.1985).
 
 
 28
 Inequitable conduct before the PTO does not necessarily warrant the award of attorney fees. Id. After reviewing ACS's arguments on appeal, we are not convinced that the district court engaged in any clearly erroneous fact finding or in any misapplication of the law in reaching its conclusion.
 
 
 29
 For these reasons, the judgment of dismissal is affirmed.
 
 
 
 [1]
 Bard and ACS have raised a number of other issues on appeal which, by virtue of our affirmance on the issue of inequitable conduct, need not be addressed
 
 
 [2]
 For example, claim 1, as originally filed, reads:
 
 
 [1]
 A small diameter guide wire comprising:
 a main wire having a distal region which is tapered progressively toward its distal end;
 a helically wound spring at the distal region of the main wire, the tapered portion of the main wire being received within the spring, the proximal end of the spring being secured to the main wire at a proximal connection adjacent the region where the main wire begins to taper;
 the distal end of the main wire terminating short of the distal end of the spring and being secured to the spring at a distal connection;
 the spring having a relatively short portion which extends distally beyond the distal end of the main wire being highly flexible and terminating in a smoothly surfaced rounded tip.
 
 
 [3]
 Bard's engineer testified that the Teflon coating was placed over the core wire and heat shrunk with a hot air gun. The process resulted in an irregular fit of the Teflon around the core wire
 
 
 [4]
 For example, in order to obtain a guide wire of .018" maximum diameter, a .002 diameter wire was coiled into a spring with an outer diameter of .018" creating an inner diameter of .014". A core wire of .014" was selected, the distal portion tapered, and the tapered portion placed inside the spring. A coating of .002" of Teflon was placed on the proximal core wire to make a main wire of .018" diameter. ACS's witness testified that the Antoshkiw reference teaches that "standard plastic coated" wire can be used which one of ordinary skill in the art would know could be very thin
 
 
 [5]
 Specifically, the application provided:
 Because the guide wire of the type of which [sic] the present invention is concerned is much smaller than a conventional guide wire (of the order of .018" diameter as compared to a conventional guide wire approximately .038" diameter), numerous additional difficulties in the construction and use of such a guide wire are presented.
 
 
 [6]
 For example, prior to filing the '390 patent application, the inventor, Bard's in-house counsel, and others knew of the Cook SMG (CWGE-1) nephrostomy wire, sold by Cook, Inc.. This wire had a solid proximal portion of .018" and a relatively shorter spring covered distal portion surrounding a tapered core member